Commonwealth *v.* Hush-Tone Industries, Inc., et al.

Tried August 12, 1971, before Judge ROGERS acting as Chancellor on behalf of the Court.

*Jeffrey Ernico,* Assistant Deputy Attorney General, for plaintiff.

*Lawrence E. Grant,* with him *Richter, Syken, Ross & Binder,* for defendants.

ADJUDICATION, December 22, 1971:

### ISSUE

This action is brought by the Attorney General in the name of the Commonwealth of Pennsylvania against two corporations, Hush-Tone Industries, Inc. and Hush-Tone Eastern, Inc., and certain individuals alleged to be their officers, employees or agents under the Unfair Trade Practices and Consumer Protection Law, Act of December 17, 1968, P. L.    , No. 387, 73 P.S. §201-1 et seq. The complaint alleges that the defendants have been engaging in the sale of a hearing device, that they have made untrue advertising claims as to the product and that they have unlawfully promoted their said product as a means of inducing persons to purchase conventional electronic hearing aids. Plaintiff seeks injunctive relief and an order of restitution of money to Pennsylvania consumers who have purchased the product. The defendants have filed an answer denying the substantive allegations of the complaint.

The provisions of the Unfair Trade Practices and Consumer Protection Law, alleged to have been violated, are subsections (4) (v), (ix) and (xiii) of Section 2, 73 P.S. §201-2(4)(v), (ix) and (xiii). By these, the following acts are included in the definition of "unfair methods of competition" and "unfair or deceptive acts or practices":

"(v) Representing that goods or services have . . . characteristics, . . . uses, benefits . . . that they do not have . . .;

(ix) Advertising goods or services with intent not to sell them as advertised:...

(xiii) Engaging in any other fraudulent conduct which creates a likelihood of confusion or misunderstanding."

The issue is, therefore, whether the activities of the defendants or any of them are unfair methods of competition or unfair or deceptive practices as thus defined.

### FINDINGS OF FACT

1. Plaintiff is the Commonwealth of Pennsylvania acting by its Attorney General.

2. Defendant, Hush-Tone Industries, Inc., is a corporation duly organized under the laws of the Commonwealth of Pennsylvania having a registered office at 121 South Broad Street, Fifth Floor, c/o Lawrence E. Grant, Esq., Philadelphia, Pennsylvania.

3. Defendant, Hush-Tone Eastern, Inc., is a foreign corporation located at Route 73 and Church Road, Mt. Laurel, New Jersey, and doing business in Pennsylvania through sales representatives on a regular basis and by advertising in the Philadelphia Inquirer and on Philadelphia radio and television stations.

4. Defendant, Rudy Bartell, is an employee of Hush-Tone Industries, Inc., and the former president of Hush-Tone Eastern.

5.. Defendant, Richard Fischer, is the service manager for Hush-Tone Industries, Inc.

6. Defendants, D. A. McGarvey and Charles F. Hagerty were employees of Hush-Tone Industries, Inc., until shortly before the trial in this matter but are no longer.

7. Defendant, Thomas O'Rourke, is the owner of the Hush-Tone Hearing Service, 1300 Fifth Avenue, Pittsburgh, Pennsylvania.

8. Defendant, Alonzo Hosford, is the president of Hush-Tone Industries, Inc., and owns the majority interest in said Hush-Tone Industries, Inc.

9. Defendant, Hush-Tone Industries, Inc., and Hush-Tone Eastern, Inc., advertise on radio, television, and in newspapers in Pennsylvania, two models of a hearing device which they call the Hush-Tone "Speech Clarifier" or "Speech Discriminator" and which will be referred to in these Findings as "the device."

10. The device consists of a plastic ear mold to the interior of which is attached a small tuning fork. It is not electrical.

11. The device is patented under #3,394,698 in which the only claimed use is that it suppresses internal head noises.

12. In said advertising it is represented that the device is a new help for nerve deafness.

13. In its advertising Hush-Tone claims that the device is already proven in over 18 months of field testing.

15. In said advertising it is represented that the device gives clearer, natural understanding to many who cannot use a hearing aid.

16. In said advertising it is represented that the device was developed through new technology in selective frequency control in the audible range.

17. In said advertising it is represented that the device clarifies the human voice without the annoyance of magnified background noise.

18. In said advertising it is represented that the device gives relief from noise pollution in reducing noise fatigue, providing safety and improved communication through clarity for better understanding in noisy environments.

19. The defendants' device does not have the characteristics, uses or benefits the defendants represent it to have as set out hereinabove in Findings of Fact numbers 12, 13, 14, 15, 16, 17 and 18 and all of said representations are false.

20. Defendants, Hush-Tone Industries, Inc., and Hush-Tone Eastern, Inc., send and otherwise supply to prospective customers, including those who inquire as the result of said advertising, a pamphlet called the "Hush-Tone Story" which contains representations concerning the device.

21. In the pamphlet the "Hush-Tone Story", the defendants represent that the tuning fork used in the device is more sensitive than those used in modern electrically powered watches.

22. In the pamphlet the "Hush-Tone Story", the defendants represent that the device fills the need for many of those who require clarification rather than amplification.

23. In the pamphlet the "Hush-Tone Story", the defendants represent that the device is a new concept in speech understanding.

24. In the pamphlet the "Hush-Tone Story", the defendants represent that the frequencies of speech sounds are unscrambled and held thereby so as to override undesirable background noises, thus being retained a fraction longer in contrast with the damaged auditory nerves affected by these frequency ranges, thereby enabling the speech sounds to be recognized by the brain.

25. In the pamphlet the "Hush-Tone Story", the defendants represent that the device is a product capable of being beneficial to a portion of older people who

have no need for amplification in the lower tones but need clarification in the higher frequencies.

26. In the pamphlet the "Hush-Tone Story", the defendants represent that the device is a product capable of being beneficial to a portion of the middle-aged people, preferably those who have worked in factories or other noisy environments who would like to protect their already impaired nerves from becoming more impaired, by filtering out unwanted background noises and other environmental noises.

27. In the pamphlet the "Hush-Tone Story", the defendants represent that the device is a product capable of being beneficial to a portion of the many factory workers of all ages whose hearing is so exposed to noises that their ability to understand the spoken word or the instructions clearly working around noisy machinery has been impaired or destroyed and that the device thus promotes safety.

28. In the pamphlet the "Hush-Tone Story", the defendants represent that the device filters background noises to their original level of intensity while causing an increase in understanding due to speech range activation.

29. In the pamphlet the "Hush-Tone Story", the defendants represent that the device offers a new concept of "natural amplification."

30. The defendants' device does not have the characteristics, uses or benefits the defendants represent it to have as set out hereinbefore in Findings of Fact 21, 22, 23, 24, 25, 26, 27, 28 and 29; and all of said representations are false.

31. The defendants, Hush-Tone Industries, Inc., and Hush-Tone Eastern, Inc., encourage their salesmen and advise their salesmen to make certain oral representations about the device.

32. The Hush-Tone salesmen are encouraged to orally represent to prospective purchasers of the device

that it filters out the unwanted background noises thereby allowing the human voice to come in without distortion.

33. The Hush-Tone salesman are encouraged to orally represent to prospective purchasers of the device that it holds speech sounds a split-second longer, allowing the brain to pick them up and interpret them.

34. The Hush-Tone salesmen are encouraged to orally represent to prospective purchasers of the device that the device can help the majority of people who have an understanding problem.

35. The defendants' device does not have the characteristics, uses and benefits which its sales persons are encouraged to represent it to have as set out hereinbefore in Findings of Fact 32, 33 and 34, and said representations are false.

36. The defendants are selling the device in the Commonwealth.

37. The device does not have acoustical properties which will enable it to filter out background noises and clarify speech sounds.

38. The device is not a new device nor is it the world's only tuning fork activated hearing device.

39. The device does not aid hearing.

40. The device has not been proven in over 18 months of field testing.

41. The device does not give clearer, natural understanding to many who cannot use a hearing aid.

42. The device does not clarify the human voice without the annoyance of magnified background noise.

43. The device does not give relief from noise pollution by reducing noise fatigue.

44. The device does not fill the need for many of those who require clarification rather than amplification.

45. The device does not unscramble speech sounds by retaining those sounds a fraction longer in contrast

to the background noise thereby enabling the speech sounds to be recognized by the brain.

46. The device is not a product beneficial to a portion of the older people who have no need for amplification in the lower tones but need clarification in the higher frequencies.

47. The devise is not a product beneficial to middle-aged people, preferably those who have worked in factories or other noisy environments who would like to protect their already impaired nerves from becoming more impaired by filtering out unwanted background noises and other environmental noises.

48. The device is not a product beneficial to a portion of the factory workers whose hearing is so exposed to noises that their ability to understand spoken words or instructions may be affected by the noisy environment in which they work.

49. The device does not give natural amplification.

50. The device does not increase understanding because of speech range activation while it filters the background noises to their original level of intensity.

51. The device is not a revolutionary device.

52. The device cannot help people who have an understanding problem.

53. The tuning fork in the device is of no value to the hearing impaired community who suffer from problems of understanding speech.

54. The device does not filter out unwanted background noises, allowing the human voice to come in without distortion.

55. The device is essentially worthless for any of the uses and purposes claimed for it by the defendants as hereinabove found.

## DISCUSSION

(a) FACTS

The human ear, like other organs of the human body, is upon close examination discovered to be a miracle of

efficiency, the creation of which it is difficult to believe is not providential. It is in three general parts: the outer ear, consisting of the auricle and the canal; the middle ear which consists of the eardrum and three delicately suspended small bones, the most interior of which is called the stapes; and the inner ear, consisting of an oval window beyond which is the organ of Corti, a complex assortment of cells suspended in a liquid interspersed between and lying upon which are hair cells which are the sensory end-organs. Sound creates vibrations of the air. These vibrations vary as to length and height. The length or frequency of vibrations create pitch; the height of the waves or vibrations produce intensity. In hearing, these vibrations impinge upon the auricles, pass through the ear canal and cause motion in the eardrum. This motion is transmitted to the bones of the middle ear and causes the stapes to move the oval window. The motion of the oval window creates waves in the liquid of the inner ear which moves the hair cells of the organ of Corti creating electrical currents. These currents are transmitted by the auditory nerve to the brain.

We are here concerned primarily with wave length or frequency, which is expressed in cycles per second. The human ear can perceive sounds from a wide range of frequencies from as low as 16 cycles per second to as high as 30,000 cycles per second, although a normal adult would have difficulty with anything over ten to twelve thousand cycles per second. Intelligible human speech is transmitted by waves whose frequencies are between 350 and 4000 cycles per second.

There are two general types of deafness which in lay terms can be described as bone deafness or nerve deafness. Bone deafness is the result of a disfunction of the bones of the ear and is called conductive deafness. We are concerned here only with nerve deafness, at least one of the causes of which is constant exposure to

noise. Nerve deafness is irreversible. It often occurs with respect to sounds in the higher ranges of frequencies.

The defendants produce and sell an article which they call Hush-Tone. This device consists of a plastic mold which is fitted to the wearer's ear and to the interior of which is coupled a very small fork-shaped metal object, referred to by defendants as a tuning fork. The device is not electrical. The defendants contend that the ear mold is a resonator having a resonant frequency of 3000 cycles per second. There are two models of the Hush-Tone, one having a tuning fork calibrated to a frequency of 300 cycles per second and the other calibrated to 700 cyles per second.

The defendants in publications of general circulation, on radio and in written material supplied prospective customers, sales persons and franchises represent that their device is an "amazing discovery" patented under number 3,394,698, which has been "proven in over 18 months of field testing" and which is "a revolutionary new development of vital importance to everyone who has any difficulty in understanding speech . . . such as in conversations or in groups or while riding in a car, listening to TV, hearing in meetings, church, on the job, etc." They further claim that "Hush-Tone gives clearer, natural understanding", that it "often works very well in cases where your doctor has advised that a hearing aid will not help." They refer to the device as a "speech clarifer" developed through "new technology." They further represent that it "clarifies the human voice without the annoyance of magnified background noise." They imply that the device protects, rehabilitates and gives "better understanding to the impaired hearing" and "relief from noise pollution in reducing noise fatigue, providing safety and improved communication through clarity for better understanding in noisy environments." The device is represented

as capable of filtering or dampening unwanted sounds but of admitting speech; of discriminating somehow between desired sounds the user wants to hear which it admits and undesired sounds which it blocks out.

The defendants' promotional material supplied to the public and to their salesmen and franchises attempt to explain how these marvels are accomplished. This literature is written in styles ranging from that of the elementary school reading book to that of a Sunday cartoon explanation of the hero's two-way wrist radio. It never rises above the latter. It is confused, confusing and contradictory. We have examined all of this material and carefully read the testimony of defendants' witnesses. Their explanation of the manner in which the device accomplishes their claimed results is, as we understand it, that the tuning fork calibrated at 300 or 700 cycles per second "co-acts" with the mold calibrated at 3000 cycles per second to encourage or enhance or indeed amplify speech which is within these ranges. The mold, it is contended, not only amplifies as it resonates, but it also causes a tone delay measured in milli-seconds which aids "understanding." From 3000 to 7000 cycles per second, the frequencies within which most noise occurs, the device is claimed to have a "filtering" action.

The model 300 sells for $189 for one and $330 for a pair. The model 700 sells for $229 each and $389 for the pair. Upon receipt of an inquiry from a person who has returned a coupon asking for the booklet called the "Hush-Tone Story," a salesman is sent to the inquirer's place of residence. So far as this record shows, the salesman's only training comes from other officers and employees of the defendants.

There is a para-medical discipline known as audiology whose practitioners are called audiologists. Audiologists are highly trained scientists qualified to carry out complicated and technical tests and to diagnose and study the various types of auditory disabilities. A physi-

cian specializing in diagnosis and treatment of diseases of the ear is called an otologist.

The Commonwealth asserts that the Hush-Tone does not do any of the things claimed for it by the defendants and is indeed worthless.

Being obliged to carry the burden of proving by a preponderance of the evidence that the representations made by the defendants concerning their device were false, the Commonwealth adduced in its case in chief the testimony of four audiologists and a physician. The defendants countered with the testimony of three physicians, only two of which had any familiarity with the device, and of two physicists.

In the interest of completeness we will comment briefly upon the testimony of each of the witnesses principally relied upon by the parties.

David A. Metz is an audiologist and is the director of speech pathology and audiology at Cleveland State University and the possessor of a master and a doctor of philosophy degrees. Dr. Metz, together with a Dr. Elaine Lasky, under contract with the Pure Food and Drug Administration of the Federal government, made a study of the Hush-Tone device which commenced in February, 1969 and extended over a thirteen-month period. Their objectives were to evaluate the efficacy of the device in speech discrimination and its effectiveness in everyday situations. They made elaborate and sophisticated tests of 64 subjects carefully chosen from a much larger group as persons within the category the defendants claimed could be aided by the device.[1] The study included testing of the subjects using the Hush-Tone 300 and 700 models, the ear mold without the tuning fork and, of course, without any prothesis what-

---

[1] In some but by no means all of the literature, the defendants claim the device can only help persons with mild nerve deafness in the high frequencies.

soever. They worked in a laboratory with accurately calibrated equipment. Their conclusions included in a lengthy and detailed report were that the device had no value. Dr. Metz was subjected to an unusually vigorous examination in which much emphasis was placed upon the fact that some of the tables accompanying the report indicated that certain subjects, and, in the case of one table, a majority of subjects, scored higher in certain of the tests when using the Hush-Tone than they did without the device. This improvement was, however, so miniscule as to be statistically insignificant, a conclusion supported not only by Dr. Metz but by an extremely able statistician produced by the Commonwealth in rebuttal.

Another audiologist, Sally G. Revoile, the holder of a master's and a doctor's degree in hearing sciences and employed by the Veterans Administration at Washington, D. C., tested 19 subjects in the spring of 1968. Dr. Revoile's tests were also sophisticated, elaborate and performed under scientifically controlled conditions. She concluded that the Hush-Tone device did not improve speech discrimination scores for hearing impaired males with mild sensorineural disorders, part of the class defendants represent might be helped by this device.

Dr. Philip E. Rosenberg, Professor of Audiology at the Temple University School of Medicine and the holder of the degree of doctor of philosophy, testified that he had evaluated a device similar to the Hush-Tone device in 1950 and rejected it for use by armed forces personnel. Dr. Rosenberg, apparently through contact with the Better Business Bureau, made a short clinical study of the device in 1967. His report was unfavorable. He was then asked by Mr. Rudy Bartell, one of the defendants, to make a further evaluation. Mr. Bartell and a Miss or Mrs. Ray brought four persons who said they were satisfied users of the Hush-Tone device to

Dr. Rosenberg's clinic. Dr. Rosenberg tested these four people with and without the device and found that one had no change, two had poorer hearing with the device, and the fourth showed a small improvement. Mr. Bartell and the Ray woman, neither so far as this record shows a trained person, complained that the test could only be valid if taken in conditions of noise or everyday life.

Mr. Norman H. Carmel, an associate of Dr. David Myers and the holder of a master's degree in audiology, also tested the device, again at the request of Mrs. Ray who was dissatisfied with Dr. Rosenberg's results. He studied five persons over a period of two months, again with the use of good equipment. Of the persons tested only one showed some slight improvement in his discrimination score when using the device. He concluded as the result of his work that the device was of "no benefit whatsoever."

Most significant, and the evidence upon which the court places the most weight is that of Dr. David Myers. Dr. Myers is a medical doctor specializing in diseases of the ear, nose and throat. He has been Professor of that subject at the School of Medicine of Temple University, at the Graduate School of Medicine at the University of Pennsylvania, and is director of Otologic research at Presbyterian Hospital, University of Pennsylvania Medical Center, and director of research in ear, nose and throat at the Presbyterian Medical Center. Mr. Carmel is employed as an audiologist by Dr. Myers and did his study of the device for Dr. Myers. Dr. Myers explained in detail the anatomy and function of the human ear, the characteristics and uses of tuning forks in the science of audiology, the respective functions of the otologist and the audiologist, the psychology of deafness, and explained the phenomenon of internal head noises, to which we will refer later in this discussion. In addition, Dr. Myers is a collector of hearing de-

vices and produced one, not dissimilar to the Hush-Tone device, which was in use in the early 19th century. It is Dr. Myers' professional opinion that a tuning fork could not aid hearing, could not aid in the discrimination of hearing, and that the Hush-Tone device could not aid in either hearing or discrimination. He further testified, and this is without contradiction on the record, that it had come to his attention that the Hush-Tone people had done little or no research on its device. In response to a series of questions put by the court, Dr. Myers stated that it was his opinion that the Hush-Tone device could not give clearer understanding to many who could not use a hearing aid, could not give a natural understanding to many who could not use a hearing aid, that the device is not capable of clarifying the human voice without the annoyance of magnified background noise, that it could not clarify the hearing of speech, that it could not rehabilitate impaired hearing, that it gives no relief from noise pollution, and that it is of no help for nerve deafness.

In addition, the Commonwealth introduced into evidence a patent number 3,394,698 issued to one Gilbert R. Calkins. The same number is used in Hush-Tone advertising in connection with the claim that this device is an "amazing patented discovery." We have read this patent with care. Its only functional claim is that it will suppress undesirable internal head noises, although it is entitled an "ear noise suppressor and speech clarifier." It is clear from the body of the patent that the claimed clarification comes about as a result of the device's ability to suppress internal sounds or noises and not as a result of any claimed effect on hearing. Internal head sounds are generally called tinnitus. As Dr. Myers instructed us, internal head noises are a mystery of otology. They occur even in people who have no hearing loss. They are noises generated in the ear and can have humming or buzzing characteristics

or sound like bells. They are not caused by external influences, and in most cases there is no cure or treatment.

The defendants rely principally on the contention that if some persons are satisfied that their hearing is improved by the device, they are warranted in representing to the public that the device will do what these satisfied persons say it does. All of the defendants' expert witnesses, except a physicist, Dr. Kurt Berman, based their evidence upon examinations of the device made after this litigation was commenced, and the only studies testified to were upon persons produced to the testers by the chief executive officer of the defendant corporations.

The defendants relied chiefly upon the evidence given by Dr. Abraham I. Goldner. This gentleman is a medical doctor licensed to practice in the City of New York with offices in New York City, shared with Dr. Julius W. Bell, also a witness for the defendants. Dr. Goldner is apparently now in private practice. Since his graduation from the Long Island College of Medicine in 1933 he has been a clinical assistant in hospitals, an employee of the Veterans' Administration and an examiner for the State Insurance Fund, apparently a New York Workmen's Compensation agency. He has also been in charge of a Hard-of-Hearing Clinic in a New York Hospital. Dr. Goldner was introduced to the Hush-Tone device by Dr. Syracuse, who will be mentioned hereinafter, for the purpose of giving evidence at this trial. His activities which seem to have been concentrated in April and May of 1971, within the several weeks prior to giving evidence, consisted of taking histories from and performing examinations upon about 50 so-called satisfied Hush-Tone wearers brought to him by the chief executive office and majority stockholder of the defendant companies. Dr. Goldner neither prepared nor issued a report of his study and was still working on his

findings at the time he testified. While some audiometric instruments seemed to have been used by Dr. Goldner, the tests apparently consisted primarily of his talking with the patient in various intensities down to a whisper. Dr. Goldner characterized these tests as subjective rather than objective. Seven of the patients examined by Dr. Goldner resided in Beaumont, Texas, and were supplied by a dealer of Hush-Tone aids, a resident in that area. Dr. Goldner concluded, primarily on the basis of the subjective evaluations of the persons being tested, that the subjects he examined were indeed benefitted by the use of the Hush-Tone. He admitted, however, that he remained skeptical concerning the device.

Dr. Julius W. Bell, Dr. Goldner's associate who assisted in some of the tests and who concurred in Dr. Goldner's conclusion that the device was of benefit, spends 85 percent of his time in the field of plastic surgery. He was also introduced to the device by Dr. Syracuse. He, like Dr. Goldner, relies primarily on the history supplied by the subjects brought to them by the president of Hush-Tone. Dr. Bell at least admitted that the improvement observed by him was slight. He further testified that the device was incapable of increasing intensity, a claim asserted by the defendants, but he admitted that it dampens tone. Dr. Bell explained the function of the tuning fork as that of dampening out certain tones, the exact opposite of the implied description of the function of that part of the device claimed by the defendants. On cross-examination, Dr. Bell described the improvements found by him and Dr. Goldner as "very tiny."

Dr. Victor Syracuse, while a medical doctor, also resident in New York, was not called as an expert witness. He merely testified that his wife used the device and that it benefited her. He stated that he had visited the Moorestown, New Jersey office of the defendant companies and that he was acquainted with Dr. Kurt Ber-

man, a physicist and stockholder of the companies. Dr. Syracuse described himself as a practitioner in the field of eye, ear, nose and throat, but specifically admitted under cross-examination that he was not an expert in the hearing field but was mainly an Opthalmologist.

Dr. Kurt Berman holds a Doctor's degree in applied physics. He is a stockholder of Hush-Tone. He testified in behalf of the defendants concerning the characteristics of the Hush-Tone device and described the mold as a Helmholtz resonator. He explained that the resonator being set at 3000 cycles per second is harmonic with the tuning fork when set at 300 cycles per second. He stated that the power of speech is the greatest between 300 and 500 cycles per second, that the tuning fork calibrated to 300 cycles per second becomes activated by speech at this frequency and being harmonic with the 3000 cycle per second mold increases the mold's resonating effect.

The defendants produced a second physicist, Dr. Kenneth Geller, who also has a Ph.D. degree in physics and who is a Professor at Drexel University. Dr. Geller's testimony consisted of a comparison of the Hush-Tone device with other acoustic circuits and stated his belief that the device could cause lower frequencies to come through with a greater amplitude than the higher frequencies and thus produce a different sound in the ear. Dr. Geller, however, had made no tests on the device itself and his testimony was entirely theoretical.

Dr. Carl A. Silver, whose degree is in statistics, was used by the defendants first to point out certain mathematical errors in Dr. Metz's report and recalled by the defendants to describe a test he had run for the defendants shortly prior to his second appearance as a witness. This test consisted of his acquiring from the president of the Hush-Tone companies, devices, some of which were exactly as supplied to the public and others of which the Hush-Tone people themselves had fitted

with a disc to occlude the area in which the tuning fork was located. This Dr. Silver called a placebo. He then experimented with the two types of devices on persons again supplied to him by the defendants. Dr. Silver permitted these subjects to wear either the placebo or the proper instrument in their homes and then tallied the results of a questionnaire. This questionnaire asked their responses as to whether they heard well or poorly with the Hush-Tone device or with the placebo, the subjects not knowing which they were wearing. His results were favorable to the Hush-Tone over the placebo.

The theoretical explanations of Drs. Berman and Geller and Dr. Silver's placebo were strongly criticized by a manufacturer of hearing aids, a Mr. Samuel F. Lybarger. Mr. Lybarger has a bachelor's degree in physics and has been active in the design of hearing aids for forty-one years. He made actual tests on the device. Mr. Lybarger concluded that the only effect on the ability to hear speech the device could have would be to reduce the ability to hear consonants. He believed Dr. Silver's placebo to be useless because it would greatly affect the transmission of sound through the device.

We are simply unimpressed with defendants' evidence. Their physicists' evidence was solely theoretical; the persons tested by their medical witnesses were all persons unknown to the testers except as having been introduced by the president of the defendant companies. Dr. Goldner's study was, as he freely admitted, highly subjective. It is incomplete and he has prepared no written report. Not only is Dr. Silver not an audiologist or a physician, the subjects he tested were again persons sent by the defendant companies and the instruments used were supplied the defendants. What properties his placebo might have could not be known to him, a statistician. Moreover, both Dr. Goldner and Dr. Silver expressed remaining skepticism. To quote Dr. Silver directly: "I would like to do some more research before

I would say, I am willing to say, this is a working device. I'm not willing to do that."

The Commonwealth has proved by the fair weight of the credible evidence that neither model of the Hush-Tone device does the things claimed for it by the defendants. Insofar as there are conflicts of opinion, we find that the opinions expressed by the three audiologists and the medical doctor who testified for the Commonwealth outweigh the opinions of the only defense witnesses who tested the device in use, Drs. Goldner and Bell, whose evaluation is based we believe primarily on testimonials by persons produced by the defendants.

(b) THE LAW.

Counsel for the defendants have not supplied us with a brief on the law. We may assume that it is their position that if they should lose on the facts there are no legal impediments to our granting relief. However, since this will apparently be the first reported case under the Unfair Trade Practices and Consumer Protection Law, it seems appropriate that some comment be made. In 1964, the National Conference of Commissioners on Uniform State Laws sponsored for adoption by states a Uniform Deceptive Trade Practices Act.[2] Uniform Laws Annotated, Volume 9A, 1967, Annual Pocket Part. Section 2 of the Pennsylvania statute defines "uniform methods of competition and unfair or deceptive acts or practices" identically as The Uniform Act defines "deceptive trade practices." The Uniform Act's precursors were the Federal Trade Commission Act enacted by Congress in 1914, C. 311, §1, 38 Stat. 717, 15 U.S.C.A. §41 et seq., and the Federal Lanham Trademark Act, enacted in 1946, Act of July 5, 1946, C. 540, 60 Stat. 427, 15 U.S.C.A. §1051 et seq. Section 5 of the

---

[2] See "Merchant and Consumer Protection: The Uniform Deceptive Trade Practices Act", 76 Yale L. J. 441 (1967), by Professor Richard F. Dole, Jr., for an enlightening discussion of the Uniform Act.

Federal Trade Commission Act, 15 U.S.C.A. §45, rendered unlawful unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce. Section 43(a) of the Federal Lanham Trademark Act, 15 U.S.C.A. §1125(a), rendered unlawful any false description or representation of goods entering into commerce. Hence the Pennsylvania statute is modeled on the Federal Trade Commission and Lanham Trademark Acts and we may look to the decisions under those Acts for guidance and interpretation. As a court, however, we do not have the advantage accruing to Federal Circuit Courts of hearing appeals from a fact finding administrative body.

As its name explicitly states, the Pennsylvania Act is a consumer protection law designed to broaden the protections afforded buyers by existing state law. Under the Pennsylvania Law, the Attorney General is given standing to bring an action in the name of the Commonwealth to enjoin temporarily or permanently any "method, act or practice" declared unlawful by the Act, Section 4 of the Law, 73 P.S. §201-4.

In order to establish a violation of Section 201-4(v) of the Law, the Attorney General must show: (1) that defendants' advertisement is a false representation of a fact, (2) that it actually deceives or has a tendency to deceive a substantial segment of its audience, and (3) that the false representation is likely to make a difference in the purchasing decision.

With specific reference to untruthful advertising the late Mr. Justice Hugo BLACK pertinently stated of the Federal Trade Commission Act: "The fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced. There is no duty resting on a citizen to suspect the honesty of those with whom he transacts business. Laws are made to protect the trusting as well as the

suspicious. The best element of business has long since decided that honesty should govern competitive enterprises, and that the rule of caveat emptor should not be relied upon to reward fraud and deception." *F.T.C. v. Standard Ed. Soc.*, 58 S. Ct. 13, 115, 302 U.S. 112, 82 L. Ed. 141. Hence it is no defense to a claim of false advertisement that no right thinking person would believe the claim, because the act is intended to protect the ignorant and unthinking and credulous members of the general public. *Charles of the Ritz Distributors Corp. v. F.T.C.*, 143 F. 2d 676 (2d Cir. 1944). A statement which creates a deceptive impression upon purchasers is proscribed although the statement might technically be true. *L. G. Balfour Co. v. F.T.C.*, 442 F. 2d 1 (7th Cir. 1971). It is the meaning that is conveyed to the average reader which must be sought out. *Grove Laboratories v. F.T.C.*, 418 F. 2d 489 (5th Cir. 1969). It is the meaning and impression arising from the sum total not only of what is said but also of all that is reasonably implied that is significant. *Speigel, Inc. v. F.T.C.*, 411 F. 2d 481 (7th Cir. 1969). Regard must be had not to fine spun distinctions and arguments that may be made in excuse but to the effect which the claims might be expected to have upon the general public. *Stein's v. Pilling*, 256 F. Supp. 238 (D.C.N.J. 1966).

Further, four principles of the cases are of special importance here:

1.  The fact that the advertiser acted in good faith is not determinative. *Koch v. F.T.C.*, 206 F. 2d 311 (6th Cir. 1953).

2.  The sufferers of diseases are especially credulous and advertisements directed to them are subject to close scrutiny. *Belmont Laboratories v. F.T.C.*, 103 F. 2d 538 (3rd Cir. 1939).

3.  The fact that the person making false claims has satisfied customers is no defense to an action for

deceptive practices. *Erickson v. F.T.C.*, 272 F. 2d 318 (7th Cir. 1959).

4. An expert may testify as to the efficacy of a device or preparation even though he has never prescribed it or is not clinically familiar with it. *Feil v. F.T.C.*, 255 F. 2d 879 (Cir. 1960); *Koch v. F.T.C.*, *supra*.

In the light of our acceptance of the Commonwealth's evidence as preponderating, these general principles strip the defendants of any conceivable defense on the law. While there is no evidence that the defendants do not believe their claims, this is immaterial. That there may be satisfied users of the device here in question is no defense if the representations concerning its characteristics, benefits and uses are not true. The defendants' advertisements seek to entice as customers the persons troubled with a most annoying infirmity and credulous of all suggestions of help. The Commonwealth's well qualified witnesses were competent although they did not and would not use the device in their own practices.

We have found as facts that the defendants' activities are within the definition of Section 2(4)(v) of the Unfair Trade Practices and Consumer Protection Law. We discover nothing in the law generally which provides a defense. The only case to which our attention is directed by the defendants is *Alberty v. F.T.C.*, 182 F. 2d 36 (D.C. Cir., 1950) and that is plainly not pertinent for the purpose for which cited. There, a dispute existed as between two acknowledged schools of medicine; here, there is only a dispute between experts as to facts.

We should not leave this subject without mentioning that the Commonwealth of Pennsylvania, unlike many other states, has no laws for the licensure of either audiologists or hearing devices. Audiology is a highly technical and well developed scientific discipline. It is further one in which there are great opportunities for

deception both as to services and products and its subjects, as the Commonwealth's public witnesses illustrate, are desperate for help, and being desperate, are especially susceptible to false representations. Both audiologists and the devices they purvey should be licensed.

The Commonwealth has not, in our view, proved a violation of either subsection (4)(ix) or (xii) of Section 2. It has not proved that any of defendants did not believe the Hush-Tone devices were or would do what was claimed, although the use of Calkins' patent number in advertisements in the light of its claim only to ameliorate internal head noises is at best disingenuous. Nor can we find fraudulent conduct creating a likelihood of confusion or misunderstanding. None of the individual defendants appear to have had any medical or scientific training. The risible, pseudo-scientific language of their promotional material as the product of a layman, not otherwise prevented by law from operating in this field, is not on its face fraudulent.

The Commonwealth has asked us to enjoin the sale of the Hush-Tone devices in the Commonwealth. The Unfair Trade Practices and Consumer Protection Law gives us no such power. The Commonwealth also requests that we order restitution to Pennsylvania purchasers of the device, presumably of the purchase price. We decline to do so. There is nothing on this record to indicate the number of purchasers, their identity, whereabouts or indeed whether any records exist. Such an order would be most difficult to enforce even if such records did exist. For this reason we will not grant this relief which we consider incidental to the purpose of this suit in equity. We are not required to do so and purchasers are not barred by our refusal from securing such relief by the fully adequate remedies at their disposal. *Fountain Hill Mills v. Amalgamated Clothing Workers' Union of America*, 393 Pa. 385, 143 A. 2d 354 (1958).

CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties to and subject matter of this litigation.

2. All of the defendants have been and defendants Hush-Tone Industries, Inc., Hush-Tone Eastern, Inc., Alonzo Hosford, Rudy Bartell, Richard Fischer and Thomas O'Rourke are presently engaged in advertising, offering for sale, selling and distributing articles known as Hush-Tone, Models 300 and 700, in and affecting the people of the Commonwealth of Pennsylvania and are, therefore, engaged in trade and commerce as defined by Section 2(3) of the Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-2(3).

3. The defendants, Hush-Tone Industries, Inc., Hush-Tone Eastern, Inc., Alonzo Hosford, Rudy Bartell, Richard Fischer and Thomas O'Rourke have and do engage in unfair methods of competition and unfair or deceptive acts or practices in that they have and do represent that said articles, Hush-Tone Models 300 and 700, and their services in fitting and supplying the same have characteristics, uses and benefits that they do not have. Said representations have a tendency to deceive a substantial segment of its audience and are likely to make a difference in the purchasing decision.

4. The activities of the defendants, Hush-Tone Industries, Inc., Hush-Tone Eastern, Inc., Rudy Bartell, Richard Fischer and Thomas O'Rourke, described in paragraph 3 of these Conclusions are unlawful by Section 3 of said Unfair Trade Practices and Consumer Protection Law.

5. This Court has power and authority by injunction to restrain and prevent said violations of said Act by virtue of Section 4 thereof.

DECREE NISI

AND Now, this 22nd day of December, 1971, it is ORDERED, ADJUDGED and DECREED that the defendants,

Hush-Tone Industries, Inc., Hush-Tone Eastern, Inc., Alonzo Hosford, Rudy Bartell, Richard Fischer and Thomas O'Rourke, their agents, servants, employees and distributors, be and each of them is restrained and enjoined from representing in advertising of any kind, in any brochure or other material supplied customers, in sales manuals supplied sales persons, in promotional literature supplied prospective customers or franchisees or in any other fashion or by any other means, that either model 300 or 700 of the Hush-Tone devices or any other substantially similar device, however named, placed by them or any of them in trade or commerce in the Commonwealth has or have all or any of the following characteristics, uses or benefits:

1. That it is a help for nerve deafness.

2. That it has been proven in field testing.

3. That it gives clearer, natural understanding to persons who cannot use a hearing aid.

4. That it clarifies the human voice without the annoyance of magnified background noise.

5. That it gives relief from noise pollution, reduces noise fatigue or provides safety and improved communication.

6. That it is more sensitive than devices used in electrically powered watches.

7. That it is beneficial to persons who require clarification rather than amplification.

8. That it is a new concept in speech understanding.

9. That it unscrambles or holds speech sounds thereby enabling them to override undesirable background noises.

10. That it rehabilitates impaired hearing.

11. That it prevents impaired nerves from being further impaired.

12. That it is beneficial to older persons who have no need for amplification in the lower tones but need clarification in the higher frequencies.

13. That it is beneficial to middle-aged persons who would like to protect their already impaired nerves from becoming more impaired by filtering out unwanted background noises and other environmental noises.

14. That it provides safety to factory workers by clarifying the spoken word in the presence of noisy machinery.

15. That it increases understanding by speech range activation as it filters background noises.

16. That it is an aid in speech discrimination.

17. That it holds speech sounds, allowing the brain more time to interpret them.

18. That it provides natural amplification of any sounds.

19. That it is or can do anything similar to the above.

The defendants, Hush-Tone Industries, Inc., Hush-Tone Eastern, Inc., Alonzo Hosford, Rudy Bartell, Richard Fischer and Thomas O'Rourke are further restrained and enjoined from representing expressly or by implication or suggestion that the claims made in the Patent numbered 3,394,698 are that the device will do any of the things above mentioned which the defendants herein named are enjoined by this decree from representing as characteristics, uses or benefits of the device.

It is further decreed that jurisdiction of this matter be retained to the end that this decree may be modified or vacated upon cause shown by application of any party and for the purposes of Section 8 of the Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-8.

The Prothonotary is directed to enter this decree nisi and give notice thereof to all parties of record and their counsel forthwith. If no exceptions are filed thereto within thirty (30) days after notice of this decree, a final decree shall be entered as of course by the Prothonotary.