**[J-35-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA ACTING BY ATTORNEY GENERAL, JOSH SHAPIRO, | : No. 16 MAP 2017 |
| | : |
| | : Appeal from the Order of the |
| | : Commonwealth Court at No. 336 MD |
| Appellant | : 2015 dated March 22, 2017 |
| | : |
| v. | : ARGUED: May 16, 2018 |
| | : |
| GOLDEN GATE NATIONAL SENIOR CARE LLC; GGNSC HOLDINGS LLC; GGNSC ADMINISTRATIVE SERVICES LLC; GGNSC CLINICAL SERVICES LLC; GGNSC EQUITY HOLDINGS LLC; GGNSC HARRISBURG LP; GGNSC HARRISBURG GP, LLC; GGNSC CAMP HILL III LP; GGNSC CAMP HILL III GP, LLC; GGNSC CLARION LP; GGNSC CLARION GP, LLC; GGNSC GETTYSBURG LP; GGNSC GETTYSBURG GP, LLC; GGNSC ALTOONA HILLVIEW LP; GGNSC ALTOONA HILLVIEW GP, LLC; GGNSC LANSDALE LP; GGNSC LANSDALE GP, LLC; GGNSC MONROEVILLE LP; GGNSC MONROEVILLE GP, LLC; GGNSC MT. LEBANON LP; GGNSC MT. LEBANON GP, LLC; GGNSC PHOENIXVILLE II LP; GGNSC PHOENIXVILLE II GP, LLC; GGNSC PHILADELPHIA LP; GGNSC PHILADELPHIA GP, LLC; GGNSC WILKES-BARRE II LP; GGNSC WILKES-BARRE II GP, LLC; GGNSC TUNKHANNOCK LP; GGNSC TUNKHANNOCK GP, LLC; GGNSC ERIE WESTERN RESERVE LP; GGNSC ERIE WESTERN RESERVE GP, LLC; GGNSC POTTSVILLE LP; GGNSC POTTSVILLE GP, LLC, | : |
| | : |
| Appellees | : |

**OPINION**

**JUSTICE DONOHUE**                                    **DECIDED:  September 25, 2018**

The Office of the Attorney General ("OAG"), on behalf of the Commonwealth, filed suit against more than two dozen nursing homes and their parent companies (collectively, "Appellees"),[1] alleging violations of the Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S. §§ 201-1 - 201.9.3 ("UTPCPL"), and unjust enrichment.  Upon consideration of Appellees' preliminary objections, the Commonwealth Court dismissed the claims and this appealed followed.[2]  For the reasons discussed herein, we find that the dismissal of the UTPCPL claims was improper, but the dismissal of the unjust enrichment claim was proper because the claim was filed prematurely.  Accordingly, we reverse the Commonwealth Court's order and remand for further proceedings.

Appellees are individual nursing homes located throughout Pennsylvania as well as their affiliated companies and parent entities.  On July 1, 2015, the OAG filed a complaint and petition for injunctive relief in the Commonwealth Court's original jurisdiction alleging violations of the UTPCPL and unjust enrichment.  The complaint named the Parent Companies and fourteen Facilities.  Following the filing of preliminary

---

[1]  Appellees include five parent companies, GGNSC Administrative Services, LLC; GGNSC Clinical Services, LLC; GGNSC Holdings, LLC; Golden Gate National Senior Care, LLC; and GGNSC Equity Holdings, LLC ("Parent Companies"), as the owners of the individual nursing home facilities ("Facilities").

[2]  *See* 42 Pa.C.S. § 723(a) (providing that this Court has jurisdiction over appeals from final orders in matters originally commenced in the Commonwealth Court, subject to three exceptions not implicated here).

objections, the OAG filed an amended complaint asserting the same claims and naming an additional eleven Facilities as defendants.[3]

Although raised under four discrete provisions of the UTPCPL, specifically, sections (4)(v), (ix), (x), and (xxi), discussed infra, the essence of the OAG's UTPCPL claims is that through deceptive advertisements and marketing materials, Appellees made materially misleading statements about the nature and quality of the care provided to their nursing home residents. Amended Complaint, 9/8/2015, ¶¶ 6, 11, 77-88. The OAG further alleged that Appellees knowingly failed to provide the level of care they advertised, as they purposefully understaffed the facilities so as to maximize their profits. *Id.,* ¶¶ 13, 16, 106. The OAG alleged that the actionable conduct occurred in chain-wide and facility-level misrepresentations. *Id.,* ¶¶ 10-11, 77-107. With regard to the chain-wide misrepresentations, the OAG claimed that through various marketing materials, including brochures, videos, websites, and video advertisements, Appellees misrepresented the level of basic care provided to their residents in their facilities. *Id.,* ¶ 82. By way of example, the OAG pointed to multiple statements, including the following:

- "Snacks and beverages of various types and consistencies are available at any time from your nurse or nursing assistant."

- "We have licensed nurses and nursing assistants available to provide nursing care and help with activities of daily living … . Whatever your needs are, we have the clinical staff to meet those needs."

- "Clean linens are provided for you on a regular basis, so you do not need to bring your own."

---

[3] The OAG also raised a claim for breach of contract, which it subsequently withdrew.

- "A restorative plan of care is developed to reflect the resident's goals and is designed to improve wellness and function. The goal is to maintain optimal physical, mental and psychological functioning."

- "A container of fresh ice water is put right next to your bed every day, and your nursing assistant will be glad to refill or refresh it for you."'

- "We work with an interdisciplinary team to assess issues and nursing care that can enhance the resident's psychological adaptation to a decrease of function, increase levels of performance in daily living activities, and prevent complications associated with inactivity."

*Id.,* ¶¶ 83-84. The OAG averred that based on information it received through former residents and employees of the Facilities, these statements are misleading because they create the impression that the Facilities will provide care that the Facilities do not in fact provide. *Id.* ¶¶ 85-87. In contrast to the impression that these statements give, the OAG claimed that residents routinely have to wait hours for food, assistance with toileting, changing of soiled bed linens, and other elements of basic care, and sometimes must forgo them entirely. *See id.*

On the individual facility level, the OAG alleged that the Facilities made misrepresentations not only by providing the marketing materials addressed above, but also in the resident assessment and care plans created for each resident. *Id.,* ¶¶ 91-92. These care plans, which are created after an evaluation of the resident and updated quarterly, detail the types of assistance that the facility will provide each resident based

upon his or her need.[4]  *Id., ¶* 92.  The OAG alleged that the services promised in the care plans were not provided because of intentional understaffing.  *Id., ¶* 98.

Further, the OAG contended that the Facilities generated billing statements which indicated that certain care was provided when it was not.  *Id. ¶¶* 99-100.  Of importance, for residents who received Medicaid or Medicare, these billing statements were paid by the Pennsylvania Department of Human Services ("DHS") with public funds.  Finally, the Commonwealth alleged that the Facilities deceived the Pennsylvania Department of Health ("DOH") as to the levels of care they provided by temporarily increasing the number of staff on hand during DOH inspections and by willfully creating inaccurate and/or falsified resident care records for DOH's review.  *See id.*, ¶¶ 101-104.

For all of these violations, the OAG sought an injunction prohibiting Appellees from engaging in the alleged misconduct, as permitted by section 4 of the UTPCPL,  as well as restitution (or "restoration"), as permitted by section 4.1 of the UTPCPL, "including monies paid by consumers and the Commonwealth in the form of per diem payments[.]"  *Id., ¶* 272 (citing 73 P.S. §§ 201-4, 201-4.1).  It also sought civil penalties of $1000 to $3000 for each violation (the amount increasing with the age of the victim), as provided by section 8(b) of the UTPCPL.  *Id., ¶* 271 (citing 73 P.S. § 201-8(b)).

Regarding its unjust enrichment claim, the OAG asserted that Parent Companies directed the Facilities to transfer the amounts received as a result of their deceptive billing practices, including amounts paid by DHS, to them.  *Id., ¶¶* 279-280.  The

---

[4]  For instance, the care plans would indicate whether staff is needed to perform various activities of daily living, and if so, how many staff members were needed.  Amended Complaint, 9/8/2015, ¶ 92.

Commonwealth asked that Parent Companies be ordered to disgorge all money received through these allegedly unlawful actions. *Id.,* ¶ 281.

Appellees filed numerous preliminary objections, challenging, inter alia, the OAG's standing to bring these claims, the failure to state claims upon which relief could be granted and insufficient specificity in the amended complaint. Following argument, the Commonwealth Court issued a lengthy opinion in which it overruled a few of Appellees' preliminary objections[5] but sustained the majority of them, and dismissed the amended complaint.

## Commonwealth Court Decision

## UTPCPL Claims

The Commonwealth Court first considered Appellees' claim that the OAG failed to establish that the complained-of marketing and advertising materials violated sections 4(v) and (xi) of the UTPCPL because the statements therein were "so vague and indefinite as to categorically qualify as puffery[,]" which is not actionable under the UTPCPL. Preliminary Objections, 10/8/2015, ¶¶ 48-49. The Commonwealth Court agreed, noting that "puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language." *Commonwealth v. Golden Gate Nat'l Senior Care LLC*, 158 A.3d 203, 215 (Pa. Commw. 2017). The court then addressed the identified statements and found each to be so broad and vague, or merely expressive of

---

[5] Appellees' challenges to the OAG's standing to bring this action were resolved by the Commonwealth Court's decision in *GGNSC Clarion LP v. Kane*, 131 A.3d 1062 (Pa. Commw. 2016), *aff'd per curiam*, 152 A.3d 983 (Pa. 2016), and so the court overruled the two preliminary objections raised on that basis. *Commonwealth v. Golden Gate Nat'l Senior Care, LLC,* 158 A.3d 203, 210 (Pa. Commw. 2017). The court also overruled Appellees' objection that the Commonwealth failed to state its claim of fraud under section (4)(xxi) of the UTPCPL with the requisite particularity. *Id.* at 226.

intent, as to constitute puffery. As such, it concluded that they could not support a claim of a UTPCPL violation on a chain-wide or facility-level basis. *Id.* at 217, 219.

With regard to its dismissal of the claims founded on resident assessments, care plans and bills, the Commonwealth Court relied primarily on a federal case from the Eastern District of Pennsylvania, *Seldon v. Home Loan Serv., Inc.*, 647 F.Supp.2d 451 (E.D. Pa. 2009), which involved claims brought pursuant to sections 4(v) and (ix) of the UTPCPL. The Commonwealth Court read *Seldon* to provide that for an alleged misrepresentation to be actionable under these provisions, the misrepresentation must have been advertised or otherwise made in a manner that impacted a purchasing decision, and further, that isolated statements to potential customers (as opposed to widespread dissemination to the public at large) do not constitute advertising. *Golden Gate*, 158 A.3d at 220-21 (discussing *Seldon*, 647 F.Supp.2d at 466). Adopting this theory, the Commonwealth Court concluded that because the statements in resident care plans were made to individual residents of the Facilities, they cannot constitute a violation. *Id.* at 222. It also reasoned that because resident care plans are created after an individual has been admitted to a facility, the statements therein could not have impacted a purchasing decision, including the decision to enter one of the Facilities. *Id.*

Having addressed the demurrers, the Commonwealth Court turned its attention to Appellees' preliminary objection on the basis of insufficient specificity. Appellees argued that the allegations in the amended complaint were insufficiently specific because the OAG failed to identify any particular care plans or resident assessments from which the care provided by the facility deviated, or to identify any particular instance when a facility billed a resident or the Commonwealth for services that were

not actually provided. *See* Preliminary Objections, 10/8/2015, ¶ 63. According to Appellees, "the only factual support the Commonwealth provided for its conclusory allegations took the form of vague, general and non-specific statements attributed to unnamed, former employees and other 'Confidential Witnesses.'" *Golden Gate*, 158 A.3d at 223 (quoting Preliminary Objections, 10/8/2015, ¶ 63).

The Commonwealth Court acknowledged that Rule of Civil Procedure 1019 requires a plaintiff to plead all facts that must be proven for recovery and that the pleading must be sufficiently specific so as to allow the defendant to prepare its defense. *Id.* at 223-24. It agreed with Appellees that the OAG failed to meet this standard because it did not make allegations as to any "particular care plan … from which the Facility deviated, or … identify[] any specific bill for services that were not provided." *Id.* at 224. The court also agreed with Appellees that the allegations were insufficiently specific because with regard to the complained-of billing statements, the OAG did not allege "how a consumer could be misled by a billing statement to believe that he received services or assistance that he had not in fact received, or how an un-itemized per diem charge could convey to a consumer that a particular service had been provided in the first place." *Id.* This error was exacerbated, in the court's view, by the fact that the OAG did not attach to the amended complaint any of the documents upon which its claim was based. *Id.* (citing Pa.R.C.P. 1019(i) (requiring pleader to attach writing upon which a claim is based to the pleading or explain inability to do so)). For these reasons, it sustained the preliminary objection.[6]

---

[6] We note that the Commonwealth Court's disposition on this point addressed only Appellees' claim of lack of specificity with regard to claims asserted under section 4(xxi). (continued…)

The last preliminary objection relating to the UTPCPL claims challenged the Commonwealth's eligibility to recover under section 4.1 of the UTPCPL, which provides as follows:

> Whenever any court issues a permanent injunction to restrain and prevent violations of this act as authorized in section 4 above, the court may in its discretion direct that the defendant or defendants restore to any person in interest any moneys or property, real or personal, which may have been acquired by means of any violation of this act, under terms and conditions to be established by the court.

73 P.S. § 201-4.1.

Appellees argued that section 4.1 limits eligibility to receive restoration to "persons" as defined in the UTPCPL, and that pursuant to this Court's decision in *Meyer v. Cmty. College of Beaver County*, 93 A.3d 806 (Pa. 2014) ("*Meyer II*"), the Commonwealth does not fall within that definition. Preliminary Objections, 10/8/2015, ¶¶ 91-94. In *Meyer II*, this Court considered whether a political subdivision agency is a "person" as that term is defined in section 2(2) the UTPCPL, such that it may be subject to liability thereunder, and decided that it is not. *See Meyer II*, 93 A.3d at 815. Appellees argued that this determination precludes the Commonwealth from being a "person" entitled to seek restoration under section 4.1 of the UTPCPL; the thrust of their argument being that the term "person" should be interpreted consistently throughout the UTPCPL. Relying heavily on a case from the United States District Court for the

_____

(…continued)

Appellees also objected on this basis to the OAG's claims raised pursuant to subsections (v) and (ix), which involve statements in marketing materials and advertisements. *Golden Gate*, 158 A.3d at 226. The court did not address that objection in terms of specificity of the allegations; instead, it sustained the objection because it had already determined that the statements in the marketing materials and advertisements were non-actionable puffery. *Id.*

Southern District of New York that discussed *Meyer II* in the context of section 4.1, the Commonwealth Court agreed, and sustained the objection. *See Golden Gate*, 158 A.3d at 229-30 (citing *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 2015 WL 4092326, at *5 (S.D.N.Y. July 2, 2015)).

### Unjust Enrichment

Appellees raised two preliminary objections to the Commonwealth's unjust enrichment claim. First, Appellees argued that the Commonwealth's claim was barred because the General Assembly has provided a statutory remedy in the Human Services Code, 62 P.S. §§ 101-1503, Act of June 13, 1967, P.L. 31, No. 21. After setting forth the definition of unjust enrichment ("the retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected, for which the beneficiary must make restitution"), the Commonwealth Court explained that pursuant to this Court's decisions and the Statutory Construction Act, where a statutory remedy exists, it must be pursued to the exclusion of all common law remedies. *Id.* at 231. Upon consideration of section 206 of the Human Services Code, 62 P.S. § 206, and multiple DHS regulations, the court found that a statutory remedy exists in the Human Services Code, as it authorizes DHS to seek restitution and repayment of reimbursements that a provider was not entitled to receive. *Id.* at 234-36. As such, it concluded that the Commonwealth was precluded from pursuing an unjust enrichment claim to recover the same amounts and dismissed the claim. *Id.* at 236.

Appellees also argued that all claims against Parent Companies must fail because the Commonwealth did not allege sufficient facts to pierce the corporate veil or impose vicarious liability. As Parent Companies and the Facilities were incorporated in

Delaware, the Commonwealth Court found that Delaware law applied to determine whether the Commonwealth alleged sufficient facts to pierce the corporate veil. *See Broderick v. Stephano*, 171 A. 582 (Pa. 1934) (providing that under Pennsylvania law, shareholder liability for corporate malfeasance is determined by the law of the state of incorporation). The court recognized that Delaware law requires proof of "exclusive domination and control" as well as a showing that the corporate form "existed for no other purpose than as a vehicle for fraud" before the corporate form will be disregarded. *Golden Gate*, 158 A.3d at 237 (quoting *Wallace v. Wood*, 752 A.2d 1175, 1183-84 (Del. Ch. 1999)). While Delaware law does not strictly require allegations of fraud to meet this standard, the Commonwealth Court recognized that to pierce the corporate veil under an alter ego theory, a plaintiff must plead facts to support the inference that the corporation created a sham entity as its alter ego for the purpose of committing fraud **or a similar injustice**. *Id.* (emphasis added) (citing *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003); *In re Foxmeyer Corp.*, 290 B.R. 229, 236 (Bankr. D. Del. 2003)). Because the OAG did not allege that Appellees used the corporate form to engage in "fraud or a similar injustice[,]" and because the amended complaint is bereft of facts that would support a conclusion that Appellees created the corporate form solely as a vehicle for fraud, the court sustained the demurrer as to this claim. *Id.* (quoting *Foxmeyer*, 290 B.R. at 236).

Having reached these conclusions, the Commonwealth Court dismissed the amended complaint.

Judge Cohn Jubelirer filed a concurring and dissenting opinion. She agreed that the marketing statements at issue were puffery and that the care plans, resident

assessment and bills are not actionable under the sections of the UTPCPL that apply to advertisements (subsections (v), (ix), and (x)). However, Judge Cohn Jubelirer recognized that subsection 4(xxi) provides a cause of action for **any** fraudulent or deceptive conduct, and concluded that it necessarily encompassed representations made in ways beyond advertisement. *Golden Gate*, 158 A.3d at 239 (Cohn Jubelirer, J., concurring and dissenting). She chastised the majority for recognizing this distinction and sua sponte raising the Commonwealth's failure to attach copies of the writings upon which this claim was based (and then relying on this failure to dismiss the claim). *Id.* In her view, Appellees waived any objection to the OAG's failure to attach writings to the amended complaint, and, she recognized, because the court chose to address a preliminary objection that Appellees did not raise, the OAG was robbed of the chance to remedy this defect. *Id.* at 239-40 (citing Pa.R.A.P. 1019(i)). Thus, she would not have dismissed the claim under section (4)(xxi) relative to the allegations involving bills, resident assessments and care plans, which in her view, could directly impact purchasing decisions. *Id.* at 240.

Judge Cohn Jubelirer also disagreed with the majority's determination that the Commonwealth cannot receive restoration under section 4.1 the UTPCPL. To begin, she noted that because the majority disposed of the underlying substantive claims, the issue of whether the Commonwealth could receive restoration was moot and therefore, that the court's pronouncement on the issue was dicta. As to the merits, Judge Cohn Jubelirer disagreed with the court's conclusion that the Commonwealth does not fit the statutory definition of a "person in interest" entitled to restoration. *Id.* at 240-41. Although she accepted the tenet of statutory construction (relied on by the majority) that

where the meaning of a word or phrase is clear as used in one section, it will be construed with the same meaning in another section of the same statute, Judge Cohn Jubelirer pointed out that this Court has expressly found that the UTPCPL is ambiguous as to the meaning of "person," and therefore that this maxim does not apply. *Id.* at 241 (citing *Meyer II*, 93 A.3d at 814). She further questioned the majority's reliance on *Meyer II*, noting that it involved the question of whether a political subdivision could be a subject to liability for punitive damages under the UTPCPL. To Judge Cohn Jubelirer, "[t]hat reasoning is not applicable here because no liability will be imposed upon a government entity; instead, the [OAG] is seeking restitution and restoration … for money the Commonwealth paid as a result of the alleged deception[,]" and "an interpretation that the Commonwealth can be a 'person of interest' in the restoration provision is permissible and consistent with our mandate to construe the terms of the UTPCPL 'liberally to effect its object of preventing unfair or deceptive practices.'" *Id.* (quoting *Commonwealth v. Monumental Props., Inc.,* 329 A.2d 812, 817 (Pa. 1974)). She admonished the court for addressing such a complex issue, on which reasonable minds can differ, in dicta, and expressed her preference that there had been no discussion thereof at all. *Id.*

### The OAG's Appeal

The OAG timely appealed and presents the following five issues challenging the Commonwealth Court's rulings:

1. Whether the [OAG] stated a claim under the [UTPCPL] by alleging that [Appellees] failed to provide residents with material things it had promised, including basic levels of assistance with daily living?

   a. Whether the Commonwealth Court improperly dismissed the [OAG's] false advertising claims at the preliminary objections phase where the [OAG] alleged

that [Appellees] engaged in unfair methods of competition and unfair or deceptive acts and practices under [subsections] (4)(v),(ix),(x) and (xxi) of the [UTPCPL]?

b.  Whether the Commonwealth Court improperly dismissed the [OAG's] claims under [subsections] (4)(v) and (xxi) of the [UTPCPL] on the basis that [Appellee's] representations and fraudulent and deceptive conduct[] did not pertain to **advertising** – though neither the [OAG's] allegations nor these sections of the [UTPCPL] are limited to "advertising"?

c.  Whether the Commonwealth Court improperly dismissed the [OAG's] claims at the preliminary objections phase for lack of specificity and failure to attach documents to the Amended Complaint under Pa.R.C[].P. 1019, without leave to amend, where the [OAG] sufficiently pled fraudulent and deceptive conduct sufficient to create confusion and misunderstanding by consumers?

2.  Whether the Commonwealth Court erred in holding that the [OAG] cannot be a "person in interest" **entitled to recover damages** in restoration or restitution when it **sues as a plaintiff** under the [UTPCPL]?

3.  Whether the Commonwealth Court erred in holding, at the preliminary objections phase, that discovery could reveal no set of facts that would support the [OAG's] well-pled allegations supporting its entitlement to "pierce the corporate veil" and impose vicarious liability against [Parent Companies]?

4.  Whether the Commonwealth Court erred in holding, on preliminary objections, that the [OAG] could not recover in unjust enrichment against [Parent Companies] **only** because [DHS] regulations supersede the [OAG's] common law unjust enrichment claims – even though the regulations apply only to nursing home "providers" and [Parent Companies], who were unjustly enriched, are **not** "providers" under those regulations?

5.  Whether the Commonwealth Court erred in holding, on preliminary objections, that the [OAG] should not be permitted leave to amend, despite the special status the General Assembly gave to the Attorney General in [section] 4 of the [UTPCPL] to "bring … action in the name of the Commonwealth" to protect the "public interest," the traditionally broad reading afforded the [UTPCPL] in service of

the public interest, and - though the Commonwealth Court presumably was not aware of them at the time - the myriad of other substantive errors in its Opinion and Order?

OAG's Brief at 5-6 (emphasis in the original).

We begin our review of these issues by recognizing that when this Court reviews rulings on preliminary objections, we deem all material facts averred in the complaint, and all reasonable inferences that can be drawn therefrom, to be true. *Vattimo v. Lower Bucks Hosp., Inc.*, 465 A.2d 1231, 1232 (Pa. 1983). The purpose of our inquiry is to determine the legal sufficiency of the complaint and whether the pleading would permit recovery if ultimately proven. *Weiley v. Albert Einstein Med. Ctr.*, 51 A.3d 202, 208-09 (Pa. Super. 2012). "When sustaining the trial court's ruling will result in the denial of claim or a dismissal of suit, preliminary objections will be sustained only where the case is free and clear of doubt." *Clemleddy Constr., Inc. v. Yorston*, 810 A.2d 693, 696 (Pa. Super. 2002). With regard to preliminary objections in the nature of demurrer, we consider "whether, on the facts averred, the law says with certainty that no recovery is possible. Where a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it." *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 274 (Pa. 2005).

## UTPCPL Claims

The first three issues presented address the dismissal of the UTPCPL claims. The UTPCPL provides twenty-one definitions of "unfair methods of competition" and "unfair or deceptive acts or practices." *See* 73 P.S. § 201-2(4). The OAG alleged that Appellees' conduct fit four of these definitions, subsections (v), (ix), (xi) and (xxi). These sections provide, in relevant part, as follows:

(4) "Unfair methods of competition" and "unfair or deceptive acts or practices" mean any one or more of the following:

*   *   *

(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

*   *   *

(ix) Advertising goods or services with intent not to sell them as advertised;

(x) Advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

*   *   *

(xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

73 P.S. § 201-2(4)(v), (ix), (x), (xxi).

## A. Claims Based on Advertising/Marketing Materials

As explained above, the Commonwealth Court dismissed the OAG's claims under sections (4)(v), (ix), (x) and (xxi) related to advertising and marketing materials based on its conclusion that those statements are puffery and therefore not actionable under the UTPCPL. The OAG challenges this determination, arguing that the court applied the wrong standard in reaching its conclusion. OAG's Brief at 31-32.

The UTPCPL was created to even the bargaining power between consumers and sellers in commercial transactions, and to promote that objective, it aims to protect the consumers of the Commonwealth against fraud and unfair or deceptive business

practices. *See Commonwealth, by Creamer v. Monumental Props., Inc.*, 329 A.2d 812, 815-16 (Pa. 1974). As a remedial statute, it is to be construed liberally to effectuate that goal. *Id.* at 816. "An act or a practice is deceptive or unfair if it has the capacity or tendency to deceive[,]" and "[n]either the intention to deceive nor actual deception must be proved; rather, it need only be shown that the acts and practices are capable of being interpreted in a misleading way." *Commonwealth ex rel. Corbett v. Peoples Benefit Servs., Inc.*, 923 A.2d 1230, 1236 (Pa. Commw. 2007) (internal quotations omitted). Where the impression created by the statement is one of exaggeration or overstatement expressed in broad language, it may be deemed non-actionable puffery. *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993).[7] There are two basic categories of "puffing" statements. The first involves hyperbolic boasting or bluster that no reasonable consumers would believe to be true; for example, a statement that a weight loss product will cause the pounds to "melt away in the blink of an eye." *See* 5 McCarthy on Trademarks and Unfair Competition § 27:38 (5th ed.). The second category involves claims of superiority over a competitor's product, *id.*, such as statements that a laboratory imaging device provided "unprecedented clarity," or the advertisement of a product as "the complete sports drink." *See Cytyc Corp. v. Neuromedical Systems, Inc.*, 12 F.Supp.2d 296, 300-01 (D. Neb. 1995); *Stokley-Van Camp, Inc. v. Coca-Cola Co.*, 646 F.Supp.2d 510, 526 (S.D. N.Y. 2003). A salient

---

[7] This Court has ruled that we may look to decisions rendered under the Federal Trade Commission Act, 15 U.S.C. § 45, and the Lanham Act, 15 U.S.C. § 1114, for guidance in interpreting the Pennsylvania Consumer Protection Law. *Commonwealth, by Creamer v. Monumental Props., Inc.*, 329 A.2d 812, 817-18 (Pa. 1974).

characteristic of statements deemed to be "puffery" is that consumers understand that the statements are not to be taken literally. This is because the law presumes that

> [t]here are some kinds of talk which no sensible man takes seriously, and if he does he suffers from his credulity. If we were all scrupulously honest, it would not be so; but, as it is, neither party usually believes what the seller says about his own opinions, and each knows it. Such statements … are rather designed to allay the suspicion which would attend their absence than to be understood as having any relation to objective truth.

*Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106 (10th Cir. 2009) (quoting *Vulcan Metals Co. v. Simmons Mfg. Co.*, 248 F.2d 853, 856 (2d Cir. 1918)). It is these characteristics – the patently hyperbolic or excessively vague character that dissuades any reasonable consumer from placing reliance thereon as fact – that render puffery non-actionable under the UTPCPL. *Id.* In contrast, where a plaintiff establishes that a statement contains believable, inaccurate statements of fact, the statement falls beyond the reach of a puffery defense. *See* Vincent N. Palladino, *Lanham Act "False Advertising" Claims: What Is A Plaintiff to Do?*, 101 Trademark Rep. 1601, 1668 (2011).

State and federal courts are united in the principle that the determination as to whether a statement is deemed puffery is a question of fact to be resolved by the finder of fact except in the unusual case where the answer is so clear that it may be decided as a matter of law. *See, e.g., In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices & Prod. Liab. Litig.*, 295 F.Supp.3d 927, 1004-05 (N.D. Cal. 2018); *Snyder v. Farnam Cos., Inc.*, 792 F.Supp.2d 712, 721–22 (D.N.J. 2011); *United Concrete & Constr., Inc. v. Red-D-Mix Concrete, Inc.*, 836 N.W.2d 807, 819 (Wisc. 2013). We

cannot conclude that the statements to which the OAG has referred[8] are so clearly understood to be hyperbolic bluster that a consumer would understand that they are meant to be discounted. Determination of whether a statement is puffery requires consideration of the overall impression of the statement and the context in which it is made. *Peoples Benefit*, 923 A.2d at 1236; *see also Alpine Bank*, 555 F.3d at 1106–07. We hesitate to conclude that consumers seeking a nursing home would necessarily find statements promising to provide food, water, and clean linens to be hyperbolic in any respect, or to be vague statements of optimism or intent. To the contrary, for residents of nursing homes, many of whom are physically compromised and require assistance with day-to-day living activities, regular access to these items is essential, and there is no reason to think that a consumer would not take these statements seriously. The Commonwealth Court's declaration that the statements were puffery as a matter of law was improper.

Compounding its error, it is evident that the Commonwealth Court did not consider the overall impressions created by the statements at issue from the view of the consumer when reaching its conclusions that they amounted to mere puffing. *See Peoples Benefit*, 923 A.2d at 1236. Contrary to the applicable standard, the court rendered its decisions as to each statement based on particular isolated words or phrases contained therein and ignored entirely the context in which these statements were made. For example, the court found that the statement, "**We believe** that respecting your individuality and dignity is of utmost importance[,]" qualified as puffery "based on the preface alone" – that is, based on the use of the phrase "we believe."

---

[8] *See supra,* pp. 3-4.

*Golden Gate*, 158 A.3d at 218 (emphasis in original).  This conclusion is erroneously based on an isolated component of the statement and ignores both the overall impression of the statement (that the Facilities will respect their residents' individuality and dignity) and the context in which it was made (as a representation to people looking for a nursing home facility to provide care for their loved ones, or even perhaps for themselves).  The Commonwealth Court also found the statement that "[a] container of fresh ice water is put right next to your bed every day, and your nursing assistant will be glad to refill or refresh it for you" to be puffery because it merely expressed "general statements of optimism" and is an exaggeration or overstatement phrased in vague language.  *Id.* at 217.  While it is difficult to see how this statement is a mere expression of "optimism," it is clear that the court did not consider the overall impression made by this statement (a resident will have ready access to water every day) or the context in which the statement is made (to allay the concerns of immobile residents).  While these are but two examples, it is evident from the Commonwealth Court's decision that it failed to apply the proper standard in its consideration of all of the complained-of statements.

### B.  Claims Based on Non-Advertising/Marketing Materials

The Commonwealth Court also dismissed the OAG's claims under subsections (v) and (xxi) based on patient assessments, care plans and billing statements on the basis that these materials are not advertisements and could not have impacted a purchasing decision, and therefore, were not actionable. *See Golden Gate*, 158 A.3d at 222.  In challenging the dismissal of these claims, the OAG argues that the

Commonwealth Court failed to appreciate that subsections (v) and (xxi) of the UTPCPL encompass conduct other than advertising.  OAG's Brief at 42.

In contrast to subsections (ix) and (x), which address advertisements of goods or services, subsection (v) prohibits conduct "**[r]epresenting** that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have," and subsection (xxi) prohibits "**[e]ngaging in any other fraudulent or deceptive conduct** which creates a likelihood of confusion or of misunderstanding."  73 P.S. § 201-2(4)(v), (xxi) (emphasis added).  It is the OAG's position that representations contained in the resident assessments, care plans and bills, as well as oral statements made by the Facilities in connection therewith, constitute "representations" that fraudulently or deceptively created expectations of services that would be provided, but were false, and therefore are actionable.  OAG's Brief at 43.

The Commonwealth Court's decision to the contrary was guided by the federal district court decision in *Seldon*.  *Seldon* involved allegations by homeowners regarding representations made by a mortgage lender in connection with a payment plan that would allow the homeowners to catch up on their delinquent mortgage.  The homeowners sued the mortgage lender, raising claims under various provisions of the Truth in Lending Act, Pennsylvania's Fair Credit Extension Uniformity Act, and, of relevance here, subsections 4(v) and (ix) of the UTPCPL.[9]  *Seldon*, 647 F.Supp.2d at

---

[9]  Recall that subsection (v) prohibits "[r]epresenting that … services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have," (continued…)

466. Addressing the UTPCPL claims, the district court determined that both subsections (v) and (ix) apply only to claims of false advertising and dismissed the claims on the basis that they were not founded on false advertisements, but rather on statements made by individual bank employees to individual homeowners. *Id.*

In the present case, the Commonwealth Court adopted the holding in *Seldon* that subsection (v) applies only to claims of false advertising. *See Golden Gate*, 158 A.3d at 220 (quoting *Seldon*, 647 F.Supp.2d at 466). Noting that the UTPCPL does not define "advertising," the Commonwealth Court turned to the definition ascribed to the same term under the Lanham Act by the District Court for the Eastern District of Pennsylvania in *Synthes, Inc. v. Emerge Med., Inc.,* 25 F.Supp.3d 617, 716-17 (E.D. Pa. 2014). In *Synthes, Inc.*, the district court determined that "commercial advertising" is comprised of four discernable components, including, most relevantly, broad dissemination as part of an organized campaign to penetrate the relevant market. *Synthes Inc.*, 25 F.Supp.2d at 716. In a similar vein, the court in *Seldon* emphasized the requirement of wide dissemination of a statement before it can be categorized as an advertisement. As such, it concluded that statements made by individuals, employees, or agents of an employer cannot constitute false advertising under the UTPCPL. *Seldon*, 647 F.Supp.2d at 466.

Based on *Synthes, Inc.* and *Seldon*'s similar conclusions, the Commonwealth Court determined that an "advertisement" for purposes of the UTPCPL requires a widely-disseminated statement made for the purpose of influencing a purchasing

(…continued)
and subsection (ix) prohibits "[a]dvertising goods or services with intent not to sell them as advertised." 73 P.S. § 201-2(4)(v), (ix).

decision, and therefore does not include claims or assurances made discretely to particular individuals. *Golden Gate*, 158 A.3d at 222. Applying that definition to the present case, the Commonwealth Court concluded that the resident assessments and care plans, which, according to the allegations in the amended complaint, are made on an individual basis with each resident, do not meet the definition of an advertisement. *Id.* The court further reasoned that because resident assessments, care plans, and billing statements are created only after a person has become a resident of a facility, they do not impact a purchasing decision, i.e., the decision whether to become a resident of a facility. *Id.* (quoting *Synthes, Inc.*, 25 F.Supp.3d at 717).

The Commonwealth Court's analysis is flawed. Its conclusion that claims raised under subsection (v) are limited to claims of false advertising is not supported by a reading of the UTPCPL in its entirety and consequently, reliance on *Seldon* is misplaced. The court in *Seldon* cited only one Superior Court case in support of its assertion that Pennsylvania courts have ruled that claims under subsections (v) and (ix) "apply only to claims of false advertising." *Seldon*, 647 F.Supp.2d at 466. The cited case, *Weinberg v. Sun Co.*, 740 A.2d 1152, 1167 (Pa. Super. 1999), *rev'd on other grounds*, 777 A.2d 442 (Pa. 2001), involved an attempt by gasoline consumers to bring a class action suit against Sunoco for allegedly deceptive advertisements that extolled the benefits of higher octane gasoline. The plaintiffs sought to assert claims under subsections (v), (vii), (ix) and (xvii) of the UTPCPL. The plaintiffs' request for class certification was denied, and it was this denial that was before the Superior Court on appeal. In the course of reviewing whether class certification was properly denied, the Superior Court considered the class certification requirements found in Rule of Civil

Procedure 1702, and in particular, the certification judge's determination that the plaintiffs must establish reliance on the allegedly false advertisements to meet the Rule 1702 criteria because all of their claims sounded in fraud. *Weinberg*, 777 A.2d at 1165. The Superior Court examined the language of the UTPCPL provisions at issue and determined that only two of these (subsections (vii) and (xvii)) sounded in fraud, while subsections (v) and (ix) "are in the nature of false advertising[,]" such that there is no requirement for a showing of reliance in order to state a claim upon which relief may be granted. *Id.* at 1167. It is plain that the Superior Court's inquiry in *Weinberg* was not geared toward, and that it did not consider, the scope of conduct encompassed by subsection (v); rather, it considered the language thereof only so far as to determine whether it established a claim in the nature of fraud. The Superior Court's consideration of subsection (v) was limited to this inquiry and should not be understood as a conclusive pronouncement regarding the breadth of conduct that falls within its terms.[10]

---

[10] The District Court in *Seldon* also pointed to *Karlsson v. F.D.I.C.*, 942 F.Supp. 1022 (E.D. Pa. 1996), as authority for its conclusion that subsection (v) claims are limited to claims of false advertising. *Karlsson* is a curious decision in that it quotes the language of subsection (v) providing that it applies to deceptive **representations**, but cites the Commonwealth Court's 1971 decision in *Commonwealth v. Hush-Tone Indus., Inc.*, for the proposition that subsection (v) claims must involve advertisements. *Id.* at 1023.

In *Hush-Tone*, the OAG brought suit against a company that was selling a hearing aid and made numerous demonstrably false statements about the hearing aid's capability. Specifically at issue in that case were television and radio advertisements, print advertisements, pamphlets and brochures created by Hush-Tone and provided to retailers and prospective customers, and oral statements made by salesmen to prospective customers. *Commonwealth v. Hush-Tone*, 4 Pa. Commw. 1, 4-8 (1971). The OAG alleged violations of subsections (v), (ix) and (xiii) of the UTPCPL. Of these three provisions, only subsection (ix) addressed advertisements; subsection (v) addressed representations and subsection (xiii), at that time, prohibited "engaging in any other fraudulent conduct" that creates a likelihood of confusion or misunderstanding. Despite explicitly acknowledging that subsection (v) prohibits false representations, when setting forth the elements required to establish a violation of (continued…)

The question of what conduct is prohibited by sections (v) and (xxi) of the UTPCPL is a matter of statutory interpretation, the rules of which are well established. The paramount goal of statutory interpretation is to give effect to the intentions of the General Assembly. 1 Pa.C.S. § 1921(a). To accomplish this, we consider the statutory language at issue not in isolation, but in the context in which it appears. *Commonwealth v. Kingston*, 143 A.3d 917, 922 (Pa. 2016); *see also Rossi v. Commonwealth*, 860 A.2d 64, 66 (Pa. 2004) ("[I]ndividual statutory provisions must be construed with reference to the entire statute of which they are a part[.]"). The best indication of legislative intent is the plain language of a statute. *Commonwealth v. Gilmour Mfg. Co.*, 822 A.2d 676, 679 (Pa. 2003). Words and phrases ordinarily should be understood according to their common and approved usage. *White Deer Twp. v. Napp*, 985 A.2d 745, 760 (Pa. 2009) (citing 1 Pa.C.S. § 1903(a)). When the words of a

---

(…continued)
subsection (v), the Commonwealth Court stated that the OAG must show, inter alia, that "defendants' advertisement is a false representation of a fact" and that the "false representation is likely to make a difference in the purchasing decision." *Id.* at 21.

This pronouncement conflates the terms "advertisement" and "representation," or, alternatively, conflates the particulars of subsections (v) and (ix). In any event, the court ultimately concluded that all of Hush-Tone's conduct – the advertisements, pamphlets and brochures, and oral statements to prospective customers – violated subsection (v). *Id.* at 23. In casting so wide a net, an argument could be made that despite using the term "advertisement" when setting forth the elements for a violation of subsection (v), the Commonwealth Court in *Hush-Tone* actually considered whether the complained-of conduct fell under the broader category of "representations," which subsection (v) addressed. That would be the correct inquiry. Accordingly, to the extent that *Hush-Tone* has been read and relied upon to support the principle that subsection (v) applies **only** to advertisements, *see, e.g., Weinberg v. Sun Co., Inc.*, 740 A.2d 1152, 1167 (Pa. Super. 1999), we disavow that interpretation as incorrect. As discussed herein, the plain language of subsection (v) indicates that it applies to conduct not limited to advertisements.

statute are clear and unambiguous, we must give effect to the plain language, and we cannot ignore the text of the statute in pursuit of its spirit. 1 Pa.C.S. § 1921(b).

With these precepts in mind, we first recognize that the statutory provisions at issue are part of section 2 of the UTPCPL, which contains the definitions of terms used therein. *See* 73 P.S. § 201-2. Subsection (4) of section 2 defines "unfair methods of competition" and "unfair or deceptive acts or practices" in twenty-one enumerated subparts. The fifth and twenty-first of these enumerations are the focus of our consideration. Subsection (v) defines as prohibited conduct "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have." 73 P.S. § 201-2(4)(v). Subsection (xxi) prohibits "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi). In contrast, in subsections (ix) and (x), the General Assembly expressly addresses "advertising." Unlike subsections (ix) and (x), neither subsections (v) nor (xxi) employ the term "advertising," but describe prohibited conduct in other, more general, terms. We cannot ignore this distinction or interpret the statute in such a way as to eliminate this distinction. *See* 1 Pa.C.S. § 1921(b); *Halko v. Bd. of Dirs. of Sch. Dist. of Foster Twp.*, 97 A.2d 793, 794 (Pa. 1953) (providing that a court may not rewrite a statute when interpreting it).[11] The Commonwealth Court's decision to the contrary does, and in that respect, it erred.

---

[11] Indeed, other definitions contained in section 2(4) speak to "disparaging" the goods or services of another and "making false or misleading statements of fact" concerning (continued…)

Of relevance here, subsection (v) prohibits "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have[,]" and subsection (xxi) prohibits "[e]ngaging in any other fraudulent or deceptive conduct" that is likely to cause confusion or misunderstanding. 73 P.S. § 201-2(4)(v), (xxi). It is clear that the terms "representing" and "engaging in any other fraudulent or deceptive conduct" encompass activities other than "advertising," as that phrase has been interpreted under the Lanham Act in *Synthes* and *Seldon*. This is evidenced by the General Assembly's use of different terms. The UTPCPL prohibits more than false advertising and the alleged untrue statements in internal documents at issue here may support claims under subsections (v) and (xxi). The OAG's claims of, inter alia, false representations regarding the extent and quality of services to be provided, clearly fit within the deceptive action descriptors in sections (v) and (xxi) -- "representing…" in section (v) and "deceptive conduct" in section (xxi). These terms both describe broad ranges of impermissible behaviors that extend well beyond advertising-related claims. We therefore conclude that claims under sections (v) and (xxi) of the UTPCPL are not limited to claims based on advertising. The dismissal of the OAG's claims on this basis, therefore, was improper.

---

(…continued)
price reductions. *See* 73 P.S. § 201-2(4)(viii), (xi). Further still, subsections (xiv) and (xvii) define prohibited conduct as "failing to comply with the terms" of a written guarantee or warranty and "making solicitations for sales of goods or services" without first providing certain information, respectively. 73 P.S. § 201-2(4)(xiv), (xvii). It is clear from these varied definitions that the General Assembly intended the UTPCPL to apply to conduct not limited to advertising. This context underscores the conclusion that subsection (v) is not meant to be limited to false advertisements.

The Commonwealth Court also dismissed the OAG's claims raised under subsection (4)(xxi) on the basis that they were insufficiently specific. Appellees challenged the specificity of the claims based on alleged deviations from care plans, resident assessments, and billing statements because the OAG did not identify any "single instance" of such conduct, and that its "vague, general and non-specific statements" were impermissibly attributed to "confidential witnesses" and "unnamed former employees[.]" *Golden Gate*, 158 A.3d at 223 (quoting Preliminary Objections, 10/8/2015, ¶¶ 62-63). The court agreed, finding that the lack of allegations "specifically identifying any particular resident care plan or MDS from which [a] Facility deviated, or any allegation identifying any specific bill for services that were not provided" proved fatal to the OAG's claim. *Id.* at 224. The court concluded that the OAG's "general allegations of wrongdoing … are not sufficiently specific to meet the pleading requirement, especially given that the documents were not attached to the [a]mended [c]omplaint, and neither the patients nor the documents were sufficiently described to permit [Appellees] to prepare a defense." *Id.*

On appeal, the OAG argues that its detailed factual allegations based on information received in interviews with former employees of the Facilities and family members of residents, and on information obtained from the Centers for Medicare and Medicaid Services, were sufficient to meet the specificity requirements of Pennsylvania Rule of Civil Procedure 1019. OAG's Brief at 45. According to the OAG, the Commonwealth Court wrongly interpreted the relevant pleading requirement to mean that the OAG was required to identify the specific evidence – for instance, the

individuals who were deceived by the alleged fraudulent or deceptive conduct, as well as when and how the deceptions occurred – in its amended complaint. *Id.* at 44-46.

Appellees, for their part, generally argue that the Commonwealth Court did not err in its determination that the OAG was required to allege the specific dates and identify the specific documents that support its claims, and that the absence of such allegations left them unable to adequately prepare a defense. Appellees' Brief at 21-23.

Pennsylvania is a fact-pleading jurisdiction; as such, a complaint must provide notice of the nature of the plaintiff's claims and also summarize the facts upon which the claims are based. *Youndt v. First Nat. Bank of Port Allegany*, 868 A.2d 539, 544 (Pa. Super. 2005). Rule of Civil Procedure 1019(a) and (b) encapsulate this theory. Rule 1019(a) provides that in pleadings, "[t]he material facts on which a cause of action or defense is based shall be stated in a concise and summary form[.]" Pa.R.C.P. 1019(a). Rule 1019(b) requires that "[a]verments of fraud or mistake shall be averred with particularity. Malice, intent, knowledge, and other conditions of mind may be averred generally." Pa.R.C.P. 1019(b). The purpose of these rules is to require the pleader to disclose material facts sufficient to notify the adverse party of the claims it will have to defend against. *Martin v. Lancaster Battery Co., Inc.,* 606 A.2d 444, 448 (Pa. 1992); *Landau v. W. Pa. Nat. Bank*, 282 A.2d 335, 339 (Pa. 1971).

While our rules require the pleading of all material facts upon which claims are based, there is no requirement to plead the evidence upon which the pleader will rely to establish those facts. *United Refrigerator Co. v. Applebaum*, 189 A.2d 253, 255 (Pa. 1963); *Unified Sportsmen of Pa. v. Pa. Game Comm'n*, 950 A.2d 1120, 1134 (Pa. Commw. 2008) (holding that to be sufficiently specific, "the complaint need not cite

evidence but only those facts necessary for the defendant to prepare a defense"). We have long recognized that "the line between pleading facts and evidence is not always bright[,]" but distilled the specificity requirement into two conditions that "must always be met: [t]he pleadings must adequately explain the nature of the claim to the opposing party so as to permit him to prepare a defense and they must be sufficient to convince the court that the averments are not merely subterfuge." *Bata v. Cent.-Penn Nat. Bank of Philadelphia*, 224 A.2d 174, 179 (Pa. 1966); *see also Martin*, 606 A.2d at 448. To assess whether a claim has been pled with the requisite specificity, the allegations must be viewed in the context of the pleading as a whole. *See Yacoub v. Lehigh Valley Med. Assocs., P.C.*, 805 A.2d 579, 589 (Pa. Super. 2002) (en banc).

The amended complaint avers that the Facilities falsely represented in care plans and patient assessments that particular care would be given to residents; that no such care was provided; and that the Facilities billed residents for services that were not provided. Amended Complaint, 9/8/2015, ¶¶ 266-269. The amended complaint contains numerous allegations of specific incidents of care that was not provided to residents in each facility. *See id.*, ¶¶ 118-239.[12] Further, the OAG identifies the precise statutory provisions it believes the Facilities' actions violated, *id.* ¶ 270(d), which definitively informs Appellees of the claims against them.

---

[12] For instance, the amended complaint sets forth the allegations of a former Certified Nurse Aide ("CNA") in the Blue Ridge Mountain facility that although residents were supposed to be given showers twice a week, several times a month the CNAs had to skip showering residents because they were understaffed; that incontinent residents were routinely left in soiled clothes because there was insufficient staff to attend to them; and that some residents' care plans indicated that they be taken for walks, but CNAs did not have time to do so. Amended Complaint, 9/8/2015, ¶ 120.

The Commonwealth Court's determination to the contrary was based on the OAG's failure to identify the particular patients and attach care plans, assessments, and bills upon which these allegations are based. *See Golden Gate*, 158 A.3d at 224 (stating that although the amended complaint contains "numerous examples of instances where [the Facilities] failed to comply with resident care plans … there are no allegations specifically identifying any particular resident care plan or [patient assessment] from which the Facility deviated, or any allegation identifying any specific bill for services … not provided"). The OAG alleges a widespread practice of misrepresentations based upon interviews with family members of patients, confidential informants and government inspectors and sets forth allegations as examples of the types of omissions of care in each of the more than two dozen Facilities. It is clear from the pleading that the OAG's allegations are based upon its investigation and facts derived from it. The amended complaint meets the specificity requirements of Rule 1019. Read as a whole, the amended complaint adequately details the nature of the claims so as to permit the Appellees to prepare a defense and satisfies this Court that the claims are not baseless subterfuge. *Bata*, 224 A.2d at 179. As the case progresses, the discovery process will afford the OAG and Appellees with the opportunity to provide evidentiary documentation. The Commonwealth Court erred in dismissing the claims based on insufficiency of the pleadings. The OAG's subsection (xxi) claims should have survived this preliminary objection, so we reverse the Commonwealth Court's ruling to the contrary.

**Eligibility for Statutory Remedy**

Section 4 of the UTPCPL gives the Attorney General and District Attorneys the authority to seek an injunction against any person it believes is engaging in or is about to engage in, any of the conduct prohibited under the UTPCPL. 73 P.S. § 201-4. Section 4.1 provides for a remedy where an injunction has been entered pursuant to section 4. It provides as follows:

> Whenever any court issues a permanent injunction to restrain and prevent violations of this act as authorized in section 4 above, the court may in its discretion direct that the defendant or defendants restore to any person in interest any moneys or property, real or personal, which may have been acquired by means of any violation of this act, under terms and conditions to be established by the court.

73 P.S. § 201-4.1.

The OAG sought restoration under section 4.1, which Appellees opposed on the theory that the OAG was ineligible to receive it. The Commonwealth Court agreed with Appellees. In reaching its conclusion, the Commonwealth Court considered this Court's decisions in *Meyer II* and *TAP Pharmaceuticals*, as well as the Southern District of New York's decision in *MTBE*. *Golden Gate*, 158 A.3d at 229-30.

Presently, the OAG focuses its argument on the court's reliance on *Meyer II*, which addressed whether a local governmental entity (in that case, a county community college) was subject to liability for monetary damages under the UTPCPL. OAG's Brief at 52. In the OAG's view, the very fact that *Meyer II* dealt with the question of governmental liability renders the analysis therein inapposite. *Id.* It challenges the Commonwealth Court's willingness to conclude that "if a sovereign government entity could not be a 'person' against whom one could recover monetary relief under the

[UTPCPL], then it must not be a 'person in interest' entitled to receive monetary relief under the [l]aw either." *Id.* at 53. According to the OAG, this analysis ignores the "obvious and compelling reasons" to treat government entities differently in circumstances where they are attempting to **obtain** restitution or restoration on behalf of the government and taxpayers, as opposed to situations in which they are claiming an immunity from liability to provide such relief. *Id.*

In response, Appellees argue that the UTPCPL defines "person" as only private persons and associations,[13] which shows that the General Assembly did not intend "person" to include public entities. Appellees' Brief at 32. They argue that where a statute uses the word "person" without including the government in the definition, the term is "ordinarily" construed to exclude government agencies. *Id.* (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989) and *Clipper Pipe & Serv., Inc., v. Ohio Cas. Ins. Co.*, 115 A.3d 1278, 1283 nn. 5-6 (Pa. 2015)). They also cite to the principle of ejusdem generis (general expressions used in a statute are restricted to persons and things similar to those enumerated in the language preceding the general expression) as supporting their position that because every entity explicitly identified in the UTPCPL's definition of "person" is private, the "any other legal entities" phrase must be construed as referring to any other **private** legal entities. *Id.* Echoing Judge Cohn Jubelirer's concurring and dissenting opinion, Appellees further point out that the General Assembly has included governmental entities in other statutory definitions of "person," and that the UTPCPL uses the terms "person" and "Attorney General"

---

13   Under the UTPCPL, "'[p]erson' means natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities." 73 P.S. § 201-2.

explicitly and conspicuously when establishing relief available, and who may obtain such relief. *Id.* at 32-33.[14]

With regard to *Meyer II*, Appellees endorse the Commonwealth Court's reliance thereon, and reiterate the Commonwealth Court's reasoning that "person" cannot have a different meaning in different subsections of the same statute, nor should it have a different meaning depending on whether the Commonwealth is the plaintiff or defendant in an action. *Id.* at 35-36. Appellees endorse the Commonwealth Court's conclusion that the arguments presently raised by the OAG were rejected by the federal district court in New York in *MTBE*. Finally, Appellees claim that the Commonwealth has no right to restoration for payments made by the federal government or residents as a further bar to their eligibility under section 4.1. *See id.* at 37-39.

We agree with the OAG that the Commonwealth Court's reliance on *Meyer II*, *Tap Pharmaceuticals* and *MTBE* is misplaced, based upon the pervasive and critical procedural and substantive differences between those cases and the case presently before the Court. In *Meyer II*, former students of the Community College of Beaver County ("College"), a political subdivision agency, sued the College after state officials decertified the College's police training program. The students asserted multiple claims, including a claim under section 9.2 of the UTPCPL, which provides "a private cause of action for 'persons' injured by other 'persons[']' employment of unfair trade practices." *Meyer II*, 93 A.2d at 807 (quoting 73 P.S. § 201-9.2). Seeking summary judgment, the

---

[14] As an example, Appellees point to multiple sections of the UTPCPL that authorize action by the "Attorney General," as opposed to a "person"; for example, section 201-4 states that the Attorney General or a district attorney (as opposed to a "person") may seek an injunction to restrain acts that violate the UTPCPL. Appellees' Brief at 33-34.

College argued, of relevance here, that the UTPCPL's definition of "person" excludes community colleges. *Id.*

The Commonwealth Court affirmed the trial court's order denying summary judgment, concluding that political subdivision agencies like the College are not immune from suit under the UTPCPL. We granted the College's request for review and reversed, identifying three bases for our decision. First, at the time the UTPCPL was adopted, the common law provided for sovereign immunity and a presumption against taking rights or property from the sovereign state. *Id.* We reasoned that the General Assembly did not intend to depart from these pervasive doctrines with the very general term, "any other legal entities." *Id.* Second, we briefly noted that the General Assembly enacted the UTPCPL to address the "fundamental inequality between buyer and seller, and to protect consumers from exploitative merchants[,]" and that there is no evidence that in so doing, the General Assembly "was concerned with and … sought to eliminate unfair trade practices in the public sphere." *Id.* Finally, we considered that as a consequence, the Commonwealth Court's interpretation would make political subdivision agencies liable for the punitive damages provided for in both the UTPCPL's public and private enforcement provisions.[15] To do so would break from "longstanding precedent that governmental agencies are ordinarily immune" from such damages, and we were of the opinion that the General Assembly would not make such a break without a clear indication of its intent to do so. *Id.* at 815. In a similar vein, we considered section 9 of the UTPCPL, which allows the Attorney General to seek, inter alia, the "dissolution, suspension or forfeiture of … the right to do business" of a "person" who

_____

[15] *See* 73 P.S. §§ 8, 9.2.

violates an injunction, and concluded that it was unlikely that the General Assembly intended to adopt a provision that would effectively allow the Attorney General to seek the elimination of political subdivisions. *Id.*

*Meyer II* is plainly inapposite. The narrow issue in that case was whether the College – a political subdivision agency – fell within the UTPCPL's definition of "person" so as to be liable for violations of the UTPCPL. In contrast, as we discuss at length below, the critical language that we are called upon to interpret in section 4.1 is "person in interest," which is not defined in the UTPCPL. Further, it is clear that the outcome in *Meyer II* was driven in large part by the College's status as a defendant in the lawsuit. Our decision therein incorporates principles underlying the doctrine of sovereign immunity, the purpose of which is to prevent the depletion of state government assets through lawsuits. *See Snead v. Soc'y for Prevention of Cruelty to Animals of Pa.*, 985 A.2d 909, 913 (Pa. 2009). The doctrine has no application here, where the OAG is bringing suit on behalf of the citizens of the Commonwealth.

Our decision in *TAP Pharmaceuticals* does not bear on the issue raised here. In *TAP Pharmaceuticals*, the OAG sued multiple pharmaceutical companies in the Commonwealth Court, claiming that by engaging in deceptive practices, the companies inflated a key figure used in determining the rate of reimbursement by the Department of Aging and the Department of Public Welfare. The Commonwealth Court found that the companies violated the UTPCPL, granted injunctive relief and further awarded the Commonwealth over $27,000,000 in restoration damages. *TAP Pharmaceutical*, 94 A.3d at 359-60. On appeal to this Court, the defendants challenged the amount of the award, but not the Commonwealth's right to a restoration award. *See id.* at 361

(summarizing defendant's arguments on appeal regarding the monetary award). The question of whether the Commonwealth could receive the award was not before this Court.

Conversely, in *MTBE*, the District Court for the Southern District of New York was faced squarely with the question of whether the Commonwealth was eligible to receive restoration under the UTPCPL. *MTBE*, 2015 WL 4092326, at *5. In its analysis, the district court considered our decisions in *Meyer II* and *TAP Pharmaceuticals*, as discussed above, and the fact that these decisions were issued on the same day, to arrive at the conclusion that "person" cannot be ascribed different meanings within the same statute, and that the definition of "person" in *Meyer II* must control so as to preclude the Commonwealth from eligibility to receive restoration under section 4.1. *Id.* at *6. In so holding, however, the federal district court ignored the fact that *Meyer II* and *TAP Pharmaceuticals* involved different statutory provisions and narrowed its view to focus only on the common use of "person" in both provisions. *See id.* Thus, *MTBE* is of no value in the case presently before this Court.

To reiterate, section 4.1 states, in relevant part, that a court "may in its discretion direct that the defendant or defendants restore to any **person in interest** any moneys or property … which may have been acquired by means of any violation of this act." 73 P.S. § 201-4.1 (emphasis added). This is the only provision of the UTPCPL that employs the term "person in interest," which is not defined in the UTPCPL. When interpreting a statute, courts must presume that the legislature did not intend any statutory language to exist as mere surplusage; consequently, courts must construe a statute so as to give effect to every word. *Reginelli v. Boggs*, 181 A.3d 293, 305 (Pa.

2018); *Commonwealth v. Ostrosky*, 909 A.2d 1224, 1232 (Pa. 2006); 1 Pa.C.S. § 1921(a). The Commonwealth Court effectively read the phrase "in interest" out of the statute entirely and gave no consideration to the phrase when rendering its statutory construction. If the General Assembly intended to restrict eligibility for a remedy under section 4.1 to those encompassed by "person" as defined in section 2(2), it could have employed that term. Instead, it defined the class of eligible recipients as any "person in interest."

Proper construction of section 4.1 requires consideration of the phrase "person in interest" as a whole. As stated hereinabove, the goal of all statutory interpretation is to "ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). The best indicator of the General Assembly's intent is the plain language of the statute. *Gilmour Mfg. Co.*, 822 A.2d at 679. The phrase at issue here encapsulates those whose interests were affected by the enjoined conduct, i.e., those who lost money or property because of the enjoinable conduct that was found to violate the UTPCPL. This expansive definition, which is broader than the statutorily-defined term "person," furthers the long-recognized directive that the UTPCPL be construed liberally to achieve its objective of preventing fraud or unfair or deceptive business practices and leveling the playing field between businesses and consumers. *See Monumental Properties, Inc.*, 329 A.2d at 817; *see also Weinberg*, 777 A.2d at 446.

This interpretation also avoids the anomalous result of granting the Commonwealth the authority to seek an injunction to stop fraudulent, unfair or deceptive business practices (as provided for in section 4), but prohibiting it from seeking restoration where it lost money or property because of the improper conduct (as

provided by section 4.1).  Accordingly, we hold that the Commonwealth is a "person in interest" as used in section 4.1 of the UTPCPL, and may seek the remedies provided thereunder.

**Unjust Enrichment and Piercing the Corporate Veil**

In connection with its unjust enrichment claim, the OAG alleges that the parent companies received the allegedly improper payments, and it seeks to pierce the corporate veil so as to recover these sums.  *See* OAG's Brief at 59; Amended Complaint, 9/8/2015, ¶¶ 279-81.  Unjust enrichment is an equitable remedy, defined as "the retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected, and for which the beneficiary must make restitution."  *Roethlein v. Portnoff Law Assocs., Ltd.*, 81 A.3d 816, 825 n.8 (Pa. 2013).  Piercing the corporate veil is similarly a matter of equity, allowing a court to disregard the corporate form and assess one corporation's liability against another.  *Mosaica Educ., Inc. v. Pa. Prevailing Wage Appeals Bd.*, 925 A.2d 176, 184 (Pa. Commw. 2007).  The corporate veil will be pierced and the corporate form disregarded "whenever justice or public policy demand[,]" *Ashley v. Ashley*, 393 A.2d 637, 641 (Pa. 1978), such as when the corporate form has been used to "defeat public convenience, justify wrong, protect fraud, or defend crime." *Mosaica Educ., Inc.*, 925 A.2d at 184.  A request to pierce the corporate veil is not an independent cause of action, but rather is a means of imposing liability established in an underlying cause of action, such as tort or breach of contract, against another.  *ITP, Inc. v. OCI Co.*, 865 F.Supp.2d 672, 684 (E.D. Pa. 2012) (providing that under Pennsylvania law, piercing

the corporate veil is not an independent cause of action); *see also Clientron Corp. v. Devon IT, Inc.*, 894 F.3d 568, 576 (3d Cir. 2018).

The thrust of the OAG's argument in favor of its unjust enrichment claim is that the allegedly ill-gotten proceeds have been siphoned out of the Facilities and passed on to the parent entities. Yet the UTPCPL claims are all based on alleged misconduct by the Facilities, either individually or chain-wide. Thus, the OAG's efforts to impose liability on Parent Companies are necessary only in the event that it obtains a judgment against the Facilities that the Facilities cannot satisfy. As this eventuality has not yet come to pass, the OAG's unjust enrichment claim is premature. We therefore affirm the dismissal of the OAG's unjust enrichment claim, but do so without prejudice to raise it at a later date in an action to enforce any judgment obtained if the circumstances so require.

## Conclusion

In conclusion, we hold that the Commonwealth Court erred in determining that the statements upon which the OAG's UTPCPL claims are based are puffery; that statements and documents other than advertisements cannot serve as the foundation for a UTPCPL claim; that the OAG's claims under subsection (4)(xxi) were insufficiently specific; and that the OAG is not entitled to seek restoration under the UTPCPL. As such, we reverse the Commonwealth Court's dismissal of the claims raised under the UTPCPL. Because the unjust enrichment claim (and attendant attempt to pierce the corporate veil) is premature, we affirm the dismissal of that claim without prejudice for the OAG to raise it, if necessary, at some point in the future. We remand this matter to

the Commonwealth Court so that it may proceed in accordance with our decision herein.[16]

Order reversed in part and affirmed in part. Case remanded for further proceedings.

Chief Justice Saylor and Justices Baer, Todd, Dougherty, Wecht and Mundy join the opinion.

---

[16] Having determined that the OAG's claims may proceed, we need not address its final issue, in which it challenges the Commonwealth Court's failure to grant it leave to file a second amended complaint. *See* OAG's Brief at 62.