**[J-59-2024] [MO: Mundy, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| IN RE: CANVASS OF PROVISIONAL BALLOTS IN THE 2024 PRIMARY ELECTION | : | No. 55 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at 628 CD |
| | : | 2024 dated July 1, 2024 Reversing |
| APPEAL OF: JAMIE WALSH | : | the Order of the Luzerne County |
| | : | Court of Common Pleas, Civil |
| | : | Division, at 2024-05082 dated May |
| | : | 15, 2024 |
| | : | |
| | : | SUBMITTED: August 7, 2024 |

## CONCURRING AND DISSENTING OPINION

**JUSTICE DONOHUE**                                        **DECIDED: September 13, 2024**

In the first issue before this Court, an elector cast a provisional ballot because he did not cast and did not surrender his requested mail-in ballot when he appeared to vote in person in his election district. I dissent from the Majority's holding that our Election Code[1] requires the Board of Elections to not count that provisional ballot because the elector failed to sign the provisional ballot envelope. In the second issue before this Court, an elector cast his provisional ballot in the election district of his former legal residence in circumstances where he was already registered in a different election district. I concur with the Majority's determination that his provisional ballot should have been counted by the Board of Elections.

In the April 23, 2024 primary election, Petitioner, Jamie Walsh, and his opponent, incumbent Mike Cabell, competed to represent the Republican Party in the general

---

[1]  25 P.S. §§ 2600-3591.

election for the 117th District of the Pennsylvania House of Representatives.[2]  On April 29, 2024, the Luzerne County Board of Elections held hearings addressing Cabell's challenge to a provisional ballot cast by elector Timothy James Wagner ("Wagner ballot") on the basis that Wagner failed to sign the provisional ballot envelope.  For his part, Walsh challenged a provisional ballot cast for Cabell by Cabell's cousin, Shane O'Donnell, ("O'Donnell ballot"), on the basis that O'Donnell was registered to vote in Schuylkill County, outside of the 117th District.  The Board of Elections concluded unanimously that the Wagner ballot should be counted but that the O'Donnell ballot should not, and Cabell petitioned for review in the trial court.[3]  Following a hearing held on May 8, 2024, at which both Wagner and O'Donnell testified, the trial court affirmed the Board's determinations on both ballots.  Trial Court Order, 5/15/2024.

The Commonwealth Court reversed both determinations in an unpublished memorandum decision.  *In re Canvass of Provisional Ballots in 2024 Primary Election*, 628 C.D. 2024, 2024 WL 3252970 (Pa. Commw. Ct. July 1, 2024) ("*2024 Primary Election*").  Citing the plain language of the Election Code, specifically 25 P.S. § 3050(a.4)(5)(ii)(A),[4] the court ruled that the Wagner ballot could not be counted because Wagner did not sign the provisional ballot envelope.  *2024 Primary Election*, 2024 WL 3252970 at *4.  Concerning the O'Donnell ballot, the Commonwealth Court deemed critical that the trial court found credible O'Donnell's claim that he did not move into his

---

[2]  The 117th District of the Pennsylvania House of Representatives encompasses all of Wyoming County and parts of Lackawanna and Luzerne Counties.

[3]  "The decision of the county board in upholding or dismissing any challenge may be reviewed by the court of common pleas of the county upon a petition filed by any petitioner aggrieved by the decision of the county board."  25 P.S. § 3050(a.4)(4)(v).

[4]  "A provisional ballot shall not be counted if: (A) either the provisional ballot envelope under clause (3) or the affidavit under clause (2) is not signed by the individual[.]"  25 P.S. § 3050(a.4)(5)(ii)(A).

new residence in Schuylkill County until March 29, 2024.  Because O'Donnell's change of residence ostensibly occurred only twenty-five days before the primary election, the court determined that under the Election Code, 25 P.S. § 2811,[5] O'Donnell was permitted to vote in the Luzerne County election district from which he moved and, therefore, that his ballot should be counted, even though his registration had changed in December of 2023.

Following the Commonwealth Court's decision, we granted Walsh's petition for allowance of appeal as to the following questions:

> 1) Whether, as a matter of first impression and of significant public importance and because this opinion conflicts with a holding of this Court, an unsigned provisional ballot should be counted where the voter demonstrated "exceedingly clear" electoral intent,

---

[5] That provision reads:

> Every citizen of this Commonwealth eighteen years of age, possessing the following qualifications, shall be entitled to vote at all elections, provided he or she has complied with the provisions of the acts requiring and regulating the registration of electors:
>
> (1) He or she shall have been a citizen of the United States at least one month.
>
> (2) He or she shall have resided in the State ninety days immediately preceding the election.
>
> (3) He or she shall have resided in the election district where he or she shall offer to vote at least thirty days immediately preceding the election, except that if qualified to vote in an election district prior to removal of residence, he or she may, if a resident of Pennsylvania, vote in the election district from which he or she removed his or her residence within thirty days preceding the election.

25 P.S. § 2811.

acted in conformity with instructions of election officials and subsequently verified that his ballot had been counted?

2) Whether, as a matter of significant public importance, a provisional ballot submitted by a voter domiciled and registered to vote elsewhere should be rejected?

*In re Canvass of Provisional Ballots in the 2024 Primary Election*, No. 328 MAL 2024, 2024 WL 3517407, at *1 (Pa. July 24, 2024) (per curiam).

> Statutory interpretation is a matter of law, and our standard of review is de novo and our scope of review is plenary. As this case requires us to engage in statutory interpretation, we are mindful of our paramount objective to give effect to the intent of our General Assembly in enacting the particular statute under review. When words of a statute are clear and explicit, we must follow them. It is only when the language is not explicit that we may examine other considerations.

*U.S. Venture, Inc. v. Commonwealth*, 255 A.3d 321, 334 (Pa. 2021) (internal citations and quotation marks omitted). We are further guided in our textual analysis of what the General Assembly intends by its rules of construction. *See* 1 Pa.C.S. 1921.

However, in addition to our ordinary canon of interpretative principles, there is a constitutional overlay to election statutes. Our Commonwealth's Constitution demands that our "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." PA. CONST. art. 1, § 5. Thus, we have a "longstanding and overriding policy in this Commonwealth to protect the elective franchise." *Petition of Cioppa*, 626 A.2d 146, 148 (Pa. 1993). Therefore, with respect to our election statutes, "we adhere to the overarching principle that the Election Code should be liberally construed so as to not deprive, inter alia, electors of their right to elect a candidate of their choice." *In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058, 1062 (Pa. 2020) ("*Ballots of Nov. 3, 2020*"); *see also Appeal of James*, 105 A.2d 64, 65 (Pa. 1954) (stating that while our election statutes are to be "strictly enforced to prevent fraud," they are "ordinarily … construed liberally in

favor of the right to vote"). In this vein, mere technicalities "should not be used to make the right of the voter insecure" and no "construction of a statute should be indulged that would disfranchise any voter if the law is reasonably susceptible of any other meaning." *Appeal of James*, 105 A.2d at 65-66 (citations and quotation marks omitted). Thus, while we must remain vigilant to protect against fraud in the enforcement of our Election Code, the Election Code's primary purpose is to enable our citizens to vote. It should not be read to disenfranchise voters based on formalistic readings of technical requirements, unless the terms of the Election Code cannot be subject to a reasonable alternative reading that preserves the right to suffrage.

### Wagner ballot

The facts relating to the Wagner ballot are not in dispute. Wagner testified at the May 8, 2024 hearing before the trial court[6] that he did not bring his mail-in ballot with him when he attempted to vote at his polling place in Lake Township, Luzerne County.[7] Trial Court Opinion, 5/22/2024, at 2 (unnumbered pages). Due to his failure to present with his mail-in ballot, Wagner was instructed by a poll worker to complete a provisional ballot. *Id.* Wagner stated that he followed the instructions of the poll worker in completing his provisional ballot, and although he did not remember if he had signed the provisional ballot envelope, it is undisputed that he did not sign it. *Id.* at 2-3. There was no allegation or evidence of fraud regarding any aspect of the casting or canvassing of Wagner's provisional ballot. *Id.* at 4-5.

Against the determination of both the Board of Elections and the trial court, the Majority affirms the Commonwealth Court's decision to discount Wagner's provisional ballot. Following the Commonwealth Court's rationale, it relies exclusively on the

---

[6] N.T., 5/9/2024, at 21-27.

[7] Wagner could not recall if he had received one. *See* N.T., 5/9/2024, at 25.

provisions of the Election Code that govern the casting and counting of provisional ballots and, in particular, the highlighted portions of Section 3050(a.4) below:

> (a.4)(1) At all elections an individual who claims to be properly registered and eligible to vote at the election district but whose name does not appear on the district register and whose registration cannot be determined by the inspectors of election or the county election board shall be permitted to cast a provisional ballot. Individuals who appear to vote shall be required to produce proof of identification pursuant to subsection (a) and if unable to do so shall be permitted to cast a provisional ballot. An individual presenting a judicial order to vote shall be permitted to cast a provisional ballot.
>
> (2) Prior to voting the provisional ballot, the elector shall be required to sign an affidavit stating the following:
>
>> I do solemnly swear or affirm that my name is _____, that my date of birth is _____, and at the time that I registered I resided at _____ in the municipality of _____ in _____ County of the Commonwealth of Pennsylvania and that this is the only ballot that I cast in this election.
>>
>> Signature of Voter/Elector
>>
>> Current Address
>>
>> Check the Reason for Casting the Provisional Ballot.
>>
>> Signed by Judge of Elections and minority inspector
>
> (3) After the provisional ballot has been cast, the individual shall place it in a secrecy envelope. **The individual shall place the secrecy envelope in the provisional ballot envelope and shall place his signature on the front of the provisional ballot envelope.** All provisional ballots shall remain sealed in their provisional ballot envelopes for return to the county board of elections.
>
> \* \* \*

(5)(i) Except as provided in subclause (ii), if it is determined that the individual was registered and entitled to vote at the election district where the ballot was cast, **the county board of elections shall compare the signature on the provisional ballot envelope with the signature on the elector's registration form and, if the signatures are determined to be genuine, shall count the ballot** if the county board of elections confirms that the individual did not cast any other ballot, including an absentee ballot, in the election.

>   (ii) A provisional ballot **shall not be counted if**:

>   (A) **either the provisional ballot envelope under clause (3)** or the affidavit under clause (2) **is not signed by the individual**;

>   (B) the signature required under clause (3) and the signature required under clause (2) are either not genuine or are not executed by the same individual;

25 P.S. § 3050(a.4) (emphasis added).

The Majority reads these provisions rigidly, strictly enforcing Section 3050(a.4)(3)'s requirement for an individual to sign the provisional ballot envelope, in particular because of the role an envelope signature plays in Sections 3050(a.4)(5)(i) (requiring comparison of the envelope signature to the voter registration form), and 3050(a.4)(5)(ii) (requiring rejection of a provisional ballot if either the affidavit described in Section 3050(a.4)(2) or the provisional ballot envelope described in Section 3050(a.4)(3) are not signed). *See* Majority Op. at 9-11. Consequently, the Majority distinguishes *Ballots of Nov. 3, 2020*, where this Court held that statutory language requiring an elector to date a mail-in ballot envelope was directory and not mandatory, and that no weighty interests were served by having the elector supply the date. *Id.* at 9. The Majority further distinguishes this case because, unlike in *Ballots of Nov. 3, 2020*, the General Assembly has here "spelled out the consequences for an elector's failure to sign the outer envelope" in Section 3050(a.4)(5)(ii). *Id.* The Majority thus rejects our generous-to-the-franchise interpretive

principles for election statutes because, although "venerable and well established," they ostensibly "only apply where there is some uncertainty about what the Election Code requires." *Id.* The Majority identifies "no uncertainty here." *Id.*

But there is uncertainty. An alternative reading of the Election Code exists that preserves Wagner's vote without reaching Section 3050(a.4)(3)'s envelope signature requirement. Here, we are confronted with an elector who appeared at the correct polling location and who undisputably was eligible to vote, but who was required to cast a provisional ballot only because he failed to present at that location with his requested mail-in ballot. Thus, the starting point of our statutory interpretation should not be Section 3050, but Section 3150.16, which concerns electors who attempt to vote in person despite having requested a mail-in ballot.

Under Section 3150.16, an "elector who receives **and votes** a mail-in ballot" is prohibited from casting a vote at a polling place. 25 P.S. § 3150.16(b)(1) (emphasis added). To prevent this risk of double voting, the "district register at each polling place shall clearly identify electors who have received and voted mail-in ballots as ineligible to vote at the polling place" and "shall not permit electors **who voted a mail-in ballot** to vote at the polling place[.]" *Id.* (emphasis added). But this prohibition is fully contingent upon the condition that the elector has already voted. Two options are available to an elector who appears to vote in person but who is listed on the register as having been issued a mail-in ballot. Ideally, the elector arrives with and surrenders their mail-in ballot at the polling location pursuant to Section 3150.16(b)(3). 25 P.S. § 3150.16(b)(3) (stating "an elector who requests a mail-in ballot and who is not shown on the district register as having voted the ballot may vote at the polling place if the elector remits the ballot and the envelope containing the declaration of the elector to the judge of elections to be spoiled and the elector signs a statement" indicating he or she has not cast their mail-in

ballot).   However, when an elector does not present with his mail-in ballot, Section 3150.16(b)(2) applies.  That provision states: "An elector who requests a mail-in ballot and who is not shown on the district register as having voted **may vote by provisional ballot under section 1210(a.4)(1)**."  25 P.S. § 3150.16(b)(2) (emphasis added).  That provision corresponds to Section 3050(a.4)(1) of Purdon's Pennsylvania Statutes, cited above.

Herein lies an ambiguity.  Section 3150.16(b)(2) does not direct an elector who fails to appear with his mail-in ballot to cast a provisional ballot pursuant to the procedures of Section 3050(a.4) generally, nor does it direct such an elector to the provisions of Section 3050(a.2), which defines the typical circumstances under which a provisional ballot is permissible.[8]  Nor does Section 3150.16(b)(2) point to Section 3050 generally.  Rather, Section 3150.16(b)(2) clearly pinpoints Section 3050(a.4)**(1)**.  One plausible explanation for why this is the case is that the other provisions that fall under Section 3050(a.4)—the signature requirement under (a.4)(3), the signature-comparison provision of (a.4)(5)(i), and the sanction provision of (a.4)(5)(ii)—simply do not apply to electors

---

[8]  That provision provides as follows:

> (a.2) If any of the following apply, the elector shall be permitted to cast a provisional ballot **in accordance with subsection (a.4)**:
>
> (1) The elector is unable to produce proof of identification:
>
> > (i) on the grounds that the elector is indigent and unable to obtain proof of identification without the payment of a fee; or
> >
> > (ii) on any other grounds.
>
> (2) The elector's proof of identification is challenged by the judge of elections.

25 P.S. § 3050(a.2) (emphasis added).

who were issued mail-in ballots but who nonetheless present on election day for in-person voting without their mail-in ballot.

When the General Assembly intended to apply Section 3050(a.4) more broadly, it knew how to do so with clarity. Under Section 3050(a.2), for instance, the General Assembly directed that, under certain conditions, "the elector shall be permitted to cast a provisional ballot **in accordance with subsection (a.4)**[.]" 25 P.S. § 3050(a.2) (emphasis added). With regard to situations where an "elector who receives an absentee ballot … and whose voted ballot is not timely received by the commission," such an elector "may only vote on election day **by provisional ballot** unless the elector brings the elector's absentee ballot" to be surrendered at the polling location. 25 P.S. 3146.3(e) (emphasis added). Thus, the provision directing mail-in ballot recipients to Section 3050(a.4)(1) is textually unique in its specificity among provisions that direct persons to cast provisional ballots.

This cannot be considered mere surplusage under our rules of construction. "When interpreting a statute, courts must presume that the legislature did not intend **any** statutory language to exist as mere surplusage; consequently, courts must construe a statute so as to give effect to every word." *Commonwealth by Shapiro v. Golden Gate National Senior Care LLC*, 194 A.3d 1010, 1034 (Pa. 2018) (emphasis added); 1 Pa.C.S. § 1921(a) ("The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions."). The legislative purpose behind this specificity in Section 3150.16(b)(2) is not explicit. However, when "the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters: … (3) [t]he mischief to be remedied … [and] (6) [t]he consequences of a particular interpretation." 1 Pa.C.S. § 1921(c).

Here, there is a clear distinction between the mischief to be remedied in the case of electors who cast a provisional ballot after appearing to vote in person without surrendering a requested mail-in ballot under Section 3150.16(b)(2) and a typical person casting a provisional ballot who is subject to all the requirements of Section 3050(a.4). A signature on the provisional ballot envelope does nothing to prevent double voting—the principal mischief to be remedied in the former case. That mischief can only be remedied when the Board of Elections confirms that no mail-in ballot from the elector has been received within the required time frame.[9] Nothing about the signature requirement of Section 3050(a.4)(3) provides any additional safeguard against such mischief. It simply has no bearing on whether a second, mail-in ballot will be received after the elector casts his provisional ballot.

By contrast, the mischief to be remedied by the envelope-signing requirement can be inferred from Section 3050(a.4)(1), which permits the casting of a provisional ballot by an individual who "**claims** to be properly registered and eligible to vote at the election district **but whose name does not appear on the district register** and whose registration cannot be determined by the inspectors of election or the county election board … ." 25 P.S. § 3050(a.4)(1) (emphasis added). The risk of fraud when a person appears to vote but who does not appear on the election district's registry is self-evident. There is a doubt at the time of casting of the provisional ballot whether the individual is permitted to vote in the election district, or at all.

Wagner, like similarly-situated individuals who present without their mail-in ballot, is not an individual who claims to be registered and eligible to vote but who does not appear on the district register. To the contrary, as was obvious to the poll workers when

_____

[9] This is a simple, mechanical determination by the Board of Elections. Either the mail-in ballot will be subsequently received or not. That determination requires no further inquiry into the elector's qualification to vote.

Wagner arrived at the polling location, he was registered to vote in that election district, and would have been permitted to vote at that location but for his failure to surrender his mail-in ballot. This is why his name appeared on the list of electors who had requested mail-in ballots, as specifically required under Section 3150.16(a). 25 P.S. § 3150.16(a)(stating that the "district register at each polling place shall clearly identify electors who have **received _and_ voted** mail-in ballots as ineligible to vote at the polling place") (emphasis added).

There was no question that Wagner was qualified to vote at the polling location. To apply for a mail-in ballot, voters must submit an application containing "the following information: (i) Date of birth. (ii) Length of time a resident of voting district. (iii) Voting district, if known. (iv) Party choice in case of primary. (v) Name." 25 P.S. §§ 3150.12(b). "They must also sign a declaration affirming, among other things, that they are 'eligible to vote by mail-in [or absentee] ballot at the forthcoming primary or election,' and that 'all of the information' supplied in the mail-in or absentee ballot application is 'true and correct.'" *Ballots of Nov. 3, 2020*, 241 A.3d at 1067 (citing 25 P.S. §§ 3150.12, 3146.2). Subsequently, "[u]pon receipt of the application, the county board of elections must confirm the elector's qualifications and verify that the elector's address on the application **matches the elector's registration**." *Id.* (emphasis added); *see also* 25 P.S. § 3150.12b ("The county board of elections, upon receipt of any application of a qualified elector under [25 P.S. § 3150.11 (concerning qualified mail-in electors)] shall determine the qualifications of the applicant by verifying the proof of identification and comparing the information provided on the application with the information contained on the applicant's permanent registration card.").

Thus, electors like Wagner, who present to vote in person without their mail-in ballots to surrender, have already undergone an extensive verification process in order

to prove that they are entitled to vote in their election district. This renders the signature requirement in 25 P.S. § 3050(a.4)(3) wholly redundant with respect to that specific class of voters. And, importantly, the trial court found as fact that Wagner never cast another vote via his mail-in ballot. Trial Court Opinion at 2 n.2 (stating the "Acting Director of Luzerne County Elections … confirmed by way of her testimony that Wagner had been issued a mail-in ballot for the 2024 Primary Election but had not cast his mail-in ballot") (citing N.T., 5/9/2024, at 21-22).[10] Once that fact was determined by the Board of Elections, there was no fair, just, or lawful reason to discard Wagner's ballot, unless one applies the Majority's rigid reading of Section 3050(a.4) without any consideration of its interplay with Section 3150.16.

For these reasons, there is a strong textual case to be made that Section 3150.16(b)(2)'s pinpoint citation to Section 3050(a.4)(1) is both purposeful and significant in the larger statutory scheme of the Election Code. Section 3050(a.4)(3)'s envelope-signing requirement, and the procedures for rejection of a provisional ballot in Sections 3050(a.4)(5)(i)-(ii), were never meant to apply to electors who vote by provisional ballot because they failed to surrender their mail-in ballot when they attempted to vote in person. This explains why Section 3150.16(b)(2) references only Section 3050(a.4)(1), to the exclusion of the remaining portions of Section 3050(a.4).

Contrary to the Majority's interpretation, I would determine that the envelope signing requirement did not apply to Wagner's provisional ballot. Moreover, even if the interaction between Sections 3150.16(b)(2) and 3050(a.4)(1) merely creates an ambiguity, we must follow the principle that no "construction of a statute should be

_____

[10] The Director further testified that, before the Luzerne County Board of Elections makes any determination regarding the acceptance of provisional ballots filed due to an elector's failure to surrender their mail-in ballot, it confirms that no mail-in ballot was received from that elector. N.T., 5/9/2024, at 28.

indulged that would disfranchise any voter if the law is reasonably susceptible of any other meaning." *Appeal of James*, 105 A.2d at 66. It is reasonable to believe that the General Assembly did not intend to combat double voting by wholly ineffective measures at great risk of disenfranchising qualified electors where there is no evidence of fraud and the intention of the voter is clear.

In response, the Majority offers no analysis to explain why the General Assembly chose to pinpoint Section 3050(a.4)(1) only in Section 3150.16(b)(2). It is simply content to ignore the General Assembly's precise language as mere surplusage to avoid what it perceived to be an "absurd, impossible of execution[,] or unreasonable" result—the existence of provisional ballots divorced from the instructions provided by Sections 3050(a.4)(2)-(12). Majority Op. at 13 (quoting 1 Pa.C.S. §1922(2)). But the Majority's discomfort with the result is no cause to ignore the plain text, particularly where the alternative result is the disenfranchisement of an eligible voter for no reason based on the statute as written.

The Majority's anxiety is created by a lack of precise instruction on how to process provisional ballots in this context, a practical consequence of disentangling Section 3050(a.4)(1) from the remainder of Section 3050(a.4). The Majority's dilemma is a consequence of the manner in which Section 3150.16(b)(2) was drafted and does not affect the question in this appeal. Our task is to apply the provisions, as written, to Wagner's ballot. More precisely, the question is: Whether the signature requirement in Section 3050(a.4)(3) applies to Wagner's ballot where the Election Code instructs only that 3050(a.4)(1) applies to voters like Wagner? The answer must be that it does not and Wagner's ballot must be counted.

**O'Donnell Ballot**

O'Donnell's provisional ballot was not counted because it was determined by the Board of Elections that he was not registered to vote in the election district where he appeared to vote, a decision affirmed by the trial court and subsequently reversed by the Commonwealth Court. Although I believe that the evidence presented in the trial court was sufficient to show that O'Donnell established his residence in Schuylkill County long before March 29, 2024, the trial court did not make a clear factual finding to that effect. Consequently, I agree with the Majority's conclusion to affirm the decision of the Commonwealth Court based on the rationale set forth in the Commonwealth Court's opinion.

**Conclusion**

Contrary to the Majority's holding today, I would reverse the Commonwealth Court's decision with respect to the Wagner ballot. On that matter, I respectfully dissent. However, I concur with the Majority's decision to affirm the Commonwealth Court's decision regarding the O'Donnell ballot.

Justice McCaffery joins this concurring and dissenting opinion.